

2001 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

11-7-2001

# Oxford Assoc v. Waste Sys Auth

Precedential or Non-Precedential:

Docket 00-2936

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2001

Recommended Citation

"Oxford Assoc v. Waste Sys Auth" (2001). *2001 Decisions.* Paper 256.
http://digitalcommons.law.villanova.edu/thirdcircuit_2001/256

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2001 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed November 7, 2001

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

Nos. 00-2936 & 00-2949

OXFORD ASSOCIATES; HPC ASSOCIATES; KING OF
PRUSSIA ARMS; SUSSEX GWYNEDD LTD. INC.;
LAKESIDE APTS. ASSOC.; CURREN PARTNERSHIP;
WHITPAIN ASSOCIATES; TOWNE COURTS APARTMENTS;
MILL CREEK ASSOCIATES; WYNDON ASSOC.; ONE
HUNDRED ONE ASSOC.; LLANBERIS ASSOCIATES;
WHITEHALL; HAVERFORD AVENUE ASSOCIATES; 113
CRICKET ASSOCIATES; BRYNWOOD INVESTORS LP;
MERION COURT INVESTORS LP; PLACE ONE
APARTMENT ASSOCIATES, L.P.; KBF ASSOCIATES L.P.,
t/a KINGSWOOD APARTMENTS; TIMBERLAKE
APARTMENT ASSOCIATES, L.P.; NORRISTOWN
ASSOCIATES; CEDARBROOK HOLDINGS; HAROLD
MELTZER; EVELYN MELTZER; NOBLE RYDAL
ASSOCIATES; VILLAGE GREEN ASSOC. LP; DEKALB
ASSOCIATES; GLEN ASSOCIATES; ETON INVESTMENTS
LP; VALLEY FORGE TOWERS APARTMENTS NORTH LP;
CHELBOURNE PLAZA CONDOMINIUM ASSOCIATION;
ELKINS COURT CONDOMINIUM ASSOCIATION; REGENCY
TOWERS APARTMENT ASSOCIATES LP; FOXCROFT
SQUARE APARTMENT ASSOCIATES LP; GREEN VALLEY
MANOR ASSOC.; GUNTRAM WEISSENBERGER; THE
WOODS ASSOC.; ROBERT KEENEY; PATRICIA T.
KEENEY; ABINGTON PLAZA ASSOCIATES; OAKWYNNE
HOUSE ASSOCIATES; TEDWYN ASSOCIATES; 429
ASSOCIATES; CONWYN ASSOCIATES; SEVILLA ASSOC.;
UNIVERSITY CITY HOUSING COMPANY; WYNNEWOOD
ASSOCIATES; TOWNLINE ASSOC.; ELM GARDEN
MANSION REALTY TRUST; ATHENS AVE. REALTY TRUST;
ELM GARDENS APTS. REALTY; HUNTERS RUN REALTY
TRUST; GRIMM BROTHERS REALTY CO.; MADISON
MANOR APTS. ASSOCIATES; TOWN & COUNTRY APTS.
ASSOCIATES; FREEDLEY COURT APTS. ASSOCIATES;

TREMONT TERRANCE APTS. ASSOCIATES; ROSEDALE
COURT ASSOCIATES; LAURWYCK APTS. LP,

Appellants in 00-2936,

and

1100 FIRST AVE. ASSOCIATES LP; 185 COMMERCE
DRIVE ASSOCIATES; 1996 PAVILION ASSOCIATES LP;
301 CITY LINE ASSOCIATES; 455 PENNSYLVANIA
AVENUE; CEDARBROOK HOLDINGS; ELIZABETH HOME,
INC.; EDWARD P. FARLEY & A. INGEBORG; MONUMENT
ROAD ASSOCIATES; NEW YORK DRIVE, LLC;
PANGBOURNE ASSOCIATES; TWINING OFFICE
ASSOCIATES; 419 W. MARSHALL STREET; GRIMM
BROS. REALTY CO., INC.; CHARLES L. MOLES; DONNA
MOLES; BARBARA ANN RONCA; CARMENICO FUNERAL
HOME, INC.,

Appellants in 00-2949,

v.

WASTE SYSTEM AUTHORITY OF EASTERN
MONTGOMERY COUNTY

On Appeal from the United States District Court
for the Eastern District of Pennsylvania

District Court Judge: Ronald L. Buckwalter
(D.C. Civ. Nos.: 99-03026 & 99-03275)

Argued July 27, 2001

Before: ROTH, BARRY, and FUENTES, Circuit Judges

(Opinion Filed: November 7, 2001)

        Kenneth E. Aaron (argued)
        Weir & Partners
        The Widener Building, Suite 500
        1339 Chestnut Street
        Philadelphia, Pennsylvania 19107
         Attorney for Appellants

2

Benjamin E. Zuckerman (argued)
Cozen and O'Connor
The Atrium
1900 Market Street
Philadelphia, Pennsylvania 19103
 Attorney for Appellee

OPINION OF THE COURT

FUENTES, Circuit Judge.

This is an appeal from orders of the District Court dismissing, for lack of standing, Count One from each of plaintiffs' separate complaints.1 Plaintiffs (collectively referred to as "the Building Owners") are owners of apartment houses and office buildings in Montgomery County, Pennsylvania. They brought their actions under 42 U.S.C. S 1983 against defendant, the Waste System Authority of Eastern Montgomery County ("Waste Authority"), asserting violations of their rights under the Commerce Clause, U.S. Const. art. I, S 8, cl. 3. Specifically, the Building Owners challenge the Waste Authority's implementation of a waste generation fee ("WGF ") structure, which has the purpose of funding a local waste processing plant. The Building Owners maintain that the Waste Authority's fee structure effectively forces them to use the local facility to the exclusion of more affordable out-of-state options, in contravention of the Commerce Clause. Because we hold that the Building Owners have standing to litigate this claim, we will reverse and remand the cases for further proceedings.

I.

Montgomery County, Pennsylvania, first forayed into

_____

1. The remaining counts of plaintiff 's two complaints involved state law claims and were dismissed pursuant to stipulated orders dated September 12, 2000. The plaintiffs filed notices of appeal from the stipulated orders on October 5, 2000. This Court consolidated these appeals by order dated October 31, 2000.

3

waste management by developing a municipal plan for solid waste disposal that divides the county into three solid waste districts, one of which is the Eastern District. Approximately two dozen municipalities of the eastern portion of the county constitute the Eastern District. In 1989, Montgomery County established the Waste Authority to serve as the municipal authority in the Eastern District.

In implementing its waste management plan, Montgomery County contracted with a private company, the Montenay Montgomery Limited Partnership ("Montenay"), to construct and operate a waste-to-steam plant. In May 1989, Montgomery County's industrial development authority issued $107 million in revenue bonds to finance the construction of a waste-to-steam plant that Montenay would purchase, build, and operate ("the Montenay Facility").

In order to ensure that the Montenay Facility generated sufficient revenue to cover its operations and to repay the bonds, Montgomery County, the Waste Authority, and the municipalities in the Eastern District enacted flow control ordinances. The ordinances required that all solid waste produced in the Eastern District be processed at the Montenay Facility. In addition, the Waste Authority imposed on trash haulers a "tipping fee" to be assessed each time the haulers deposited trash for processing at the Montenay Facility. The tipping fee was set at a level sufficient to cover the expenses and liabilities of managing the Montenay Facility, as well as to enable Montenay to repay the bonds. As a result of the ordinances and the tipping fees, trash haulers were obligated to bring all Eastern District waste to transfer stations for later processing at the Montenay Facility and to pay an above market tipping fee for the waste processing service.

In 1994, the United States Supreme Court decided the case of C&A Carbone, Inc. v. Town of Clarkstown, New York, 511 U.S. 383 (1994), placing the Eastern District flow control scheme in jeopardy. The Court ruled that flow control systems, such as the one implemented by Montgomery County, violate the Commerce Clause. Montgomery County responded to C&A Carbone by forming a Blue Ribbon Panel in 1997 to devise a new method of

4

ensuring Montenay an adequate revenue stream to operate the waste disposal facility and to repay its debt obligations.

In early 1998, the Blue Ribbon Panel recommended that the Waste Authority use its governmental power to create a waste generating fee structure. On January 1, 1999, the Waste Authority adopted the panel's recommendation. This new WGF structure differs from the previous flow control system in that it transfers the burden of generating revenue for the Montenay facility from trash haulers to waste generators. Haulers of trash that originated within the Eastern District are no longer charged a tipping fee. Instead, these haulers are allowed to dump free of charge, creating an economic incentive for them to dispose of their waste at Waste Authority facilities. The lost revenue from tipping fees is offset by the annual WGF that the Waste Authority assesses upon property owners in the Eastern District.[2] As a result, the Building Owners must continue to pay private trash haulers to transport their waste, and must also pay a new and separate WGF to the Waste Authority for the processing of that waste. To cover the costs of operating the Montenay Facility and financing the bonds, the Waste Authority calculates that it must assess a WGF of $76.25 per ton. The Building Owners contend that this rate greatly exceeds the interstate market rate, which they estimate at $48 to $50 per ton.

The Building Owners allege that the purposes and effects of both the abolition of the tipping fee and the imposition of the WGF, are to compel them to subsidize trash processing at the Montenay Facility, and to encourage trash haulers to utilize the Montenay Facility because any other facility would require haulers to pay for dumping. They contend that under the WGF structure (1) all waste generat ed

_____

2. The Waste Authority classifies these lands by use and sets the WGF at a per ton rate according to the estimated annual tonnage of solid waste that a given land classification will produce. For example, the Waste Authority charges apartment building owners a WGF for each apartment unit, estimating that one apartment will generate 0.72 tons of trash annually. In contrast, the Waste Authority assesses office building owners a WGF measured by the total square footage of gross floor area in the office building. It estimates that offices produce one ton of waste annually for every 2000 square feet.

within the Eastern District will still have to be disposed of in the Eastern District and (2) the Waste Authorit y will still force the participants in the waste processing industry to cover the expense of the Montenay Facility bonds and its operating costs. Finally, the property owners assert that if they were to refuse to pay the WGF, the Waste Authority could use its municipal powers to impose liens on their real property.

Asserting Commerce Clause challenges to the WGF structure, the Building Owners brought these actions in the United States District Court for the Eastern District of Pennsylvania. The Waste Authority filed motions for judgment on the pleadings under Fed. R. Civ. P. 12(c), arguing that the Building Owners lacked standing. The District Court agreed with the Waste Authority and dismissed the actions. The Building Owners appealed, and we consolidated the appeals.

We have jurisdiction pursuant to 28 U.S.C. S 1291. We exercise plenary review over the District Court's decision to grant, on standing grounds, the Waste Authority's Rule 12(c) motions. See Green v. Fund Asset Mgmt., L.P., 245 F.3d 214, 220 (3d Cir. 2001); UPS Worldwide Forwarding, Inc. v. U.S. Postal Service, 66 F.3d 621, 624 (3d Cir. 1995). To that end, we " `view the facts presented in the pleadings and the inferences to be drawn therefrom in the light most favorable to the . . . non-moving party,' " and may affirm only if the Building Owners "would not be entitled to relief under any set of facts that could be proved" consistent with the complaints' allegations. Green, 245 F.3d at 220 (quoting Inst. for Scientific Info., Inc. v. Gordon & Breach, Science Publishers, Inc., 931 F.2d 1002, 1004 (3d Cir. 1991)).

II.

The Building Owners contend that they have a right to unimpeded access to the interstate market for waste disposal services and that the District Court erred in holding that they lack standing. The Waste Authority replies that the Building Owners lack prudential standing because their claims do not fall within the zone of interests protected by the Commerce Clause. It argues that payment

6

of the WGF constitutes, at most, a local injury unrelated to the Commerce Clause's purposes of preventing both economic protectionism and retaliatory measures between the states. We hold that the District Court erred in finding that the Building Owners lacked standing.

A.

We begin by reviewing the basic principles of standing. We have previously described standing as a doctrine "comprised of both constitutional and prudential components." Conte Bros. Auto., Inc. v. Quaker State-Slick 50, Inc., 165 F.3d 221, 225 (3d Cir. 1998); accord Bennett v. Spear, 520 U.S. 154, 162 (1997). Elaborating upon this description, we have stated that "[t]he constitutional component, derived from the Art. III `case' or`controversy' requirement, requires a plaintiff to demonstrate that he or she suffered `injury in fact,' that the injury is`fairly traceable' to the actions of the defendant, and that the injury will likely be redressed by a favorable decision." Conte Bros., 165 F.3d at 225; accord Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 102-03 (1998). The Waste Authority does not contest that the Building Owners meet these three " `irreducible constitutional minim[a] of standing.' " United States v. Hays, 515 U.S. 737, 742 (1995) (quoting Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992)).

Instead, the Waste Authority argues that the Building Owners fail to satisfy prudential standing requirements. Prudential considerations constitute a supplemental aspect of the basic standing analysis and address concerns regarding the need for judicial restraint. See Davis v. Phila. Hous. Auth., 121 F.3d 92, 96 (3d Cir. 1997) ("In addition to the constitutional standing requirements, federal courts have developed prudential standing considerations`that are part of judicial self-government.' ") (quoting UPS Worldwide Forwarding, 66 F.3d at 626). Prudential standing entails an inquiry into a plaintiff 's role because "[t]he aim of this form of judicial self-governance is to determine whether the plaintiff is `a proper party to invoke judicial resolution of the dispute and the exercise of the court's remedial powers.' " Conte Bros., 165 F.3d at 225 (quoting Bender v.

7

Williamsport Area Sch. Dist., 475 U.S. 534, 546 n.8 (1986)). We therefore use the prudential limits of standing to ensure that only those parties who can best pursue a particular claim will gain access to the courts. See Gladstone, Realtors v. Vill. of Bellwood, 441 U.S. 91, 99–100 (1979).

We have articulated the test for assessing whether a party satisfies prudential standing as follows:

> [Prudential limits] require that (1) a litigant assert his [or her] own legal interests rather than those of third parties, (2) courts refrain from adjudicating abstract questions of wide public significance which amount to generalized grievances, and (3) a litigant demonstrate that her interests are arguably within the zone of interests intended to be protected by the statute, rule or constitutional provision on which the claim is based .

Davis, 121 F.3d at 96 (emphasis added) (internal quotations and citation omitted); accord Conte Bros., 165 F.3d at 225–26. In this appeal, the Waste Authority argues only that the Building Owners fail to fulfill the third requirement, that of the zone of interests. In addressing that component of prudential standing, we have advocated a "liberal" employment of the zone of interests test, explaining that it is "not meant to be especially demanding." Davis, 121 F.3d at 98, 101 (internal quotations and citation omitted).

Here, we make our zone of interests determination in the context of the dormant Commerce Clause. The Commerce Clause of the United States Constitution provides that "Congress shall have Power . . . to regulate Commerce . . . among the several States." U.S. Const. art.I,S 8. The Supreme Court has explained that the Commerce Clause was not only designed to protect the states, but was also "intended to benefit those [individuals] who . . . are engaged in interstate commerce. The `[c]onstitutional protection against burdens on commerce is for [their] benefit.' " Dennis v. Higgins, 498 U.S. 439, 448–49 (1991) (quoting Morgan v. Virginia, 328 U.S. 373, 376–77 (1946)). While the Commerce Clause explicitly confers power to Congress, it"has been interpreted to contain `an implied limitation on the power of the States to interfere with or impose burdens on interstate

8

commerce.' " Tolchin v. Supreme Court of the State of New Jersey, 111 F.3d 1099, 1106 (3d Cir.. 1997) (quoting Western & Southern Life Ins. Co. v. State Bd. of Equalization of California, 451 U.S. 648, 652 (1981). This implied limitation is often referred to as the "dormant Commerce Clause." Remarking upon the dormant Commerce Clause's role in guarding against arbitrary barriers to trade, the Supreme Court has elaborated that:

> every farmer and every craftsman shall be encouraged to produce by the certainty that he will have free access to every market in the Nation, that no home embargoes will withhold his exports, and no foreign state will by customs duties or regulations exclude them. Likewise, every consumer may look to the free competition from every producing area in the Nation to protect him from exploitation by any. Such was the vision of the Founders; such has been the doctrine of this Court which has given it reality.

H.P. Hood & Sons, Inc. v. DuMond, 336 U.S. 525, 539 (1949). The Building Owners contend that such Commerce Clause concerns are implicated by the Waste Authority's WGF structure, which, they claim, thwarts their ability to access the interstate market in waste disposal services.

B.

We agree with the Building Owners. If they succeed in proving the allegations of their complaint, they will demonstrate that the Waste Authority is forcing waste generators to use the Montenay Facility and is forcing them to pay a non-competitive fee to use that Facility.

The Supreme Court has held that the Commerce Clause is offended by ordinances that "hoard[ ] solid waste, and the demand to get rid of it, for the benefit of the preferred processing facility." See C&A Carbone, 511 U.S. at 392. We conclude that, as plaintiffs have alleged, the Montenay scheme offends the Commerce Cause in just this manner by benefitting the preferred Montenay Facility. Moreover, the waste generators are directly involved in this stream of commerce. They are consumers of the waste processing industry. In paying the WGF, they are directly paying the

costs of maintaining the preferred facility and they are precluded by economic factors from accessing less expensive waste processing facilities. As a result, their interests, as consumers of waste processing services, are within the zone of interests intended to be protected by the Commerce Clause.

Two recent courts of appeals decisions support our analysis. In these cases, parties, similarly situated to the Building Owners, were held to have prudential standing to contest a municipality's waste disposal scheme. See On the Green Apartments L.L.C. v. City of Tacoma, 241 F.3d 1235 (9th Cir. 2001); Huish Detergents, Inc. v. Warren County, Ky., 214 F.3d 707 (6th Cir. 2000).3  We find these decisions to be persuasive.

In Huish Detergents, Warren County granted a single trash hauler a five-year exclusive right to collect and process all municipal waste generated in the city of Bowling Green. See 214 F.3d at 708. The county obligated the hauler to operate the facilities that processed the city's waste, effectively prohibiting the use of any out-of-state disposal sites. Id. at 708-09. The county required all residences, commercial establishments, and industrial facilities to utilize the designated hauler's services to dispose of their waste. Id. at 709. Huish Detergents, a company which operated a laundry detergent manufacturing facility, brought a dormant Commerce Clause challenge to this waste disposal scheme. Id. The Sixth Circuit held that the plaintiff had prudential standing to litigate its claim because it was asserting its individual right as a consumer to purchase processing or disposal services across state boundaries, an interest that falls "squarely within the zone of interests protected by the Commerce Clause." Id. at 711. The court explained that the Commerce Clause protects not only producers, but also consumers who seek to benefit from free competition across the nation. Id. The court concluded by stating that "waste generators participate directly in commerce, and the Commerce Clause guarantees to them access to the interstate market for waste-related services." Id. at 711-12.

---

3. We note that the District Court did not have the benefit of these opinions, which were rendered after its Rule 12(c) decisions were issued.

10

The following year, the Ninth Circuit decided On the Green. In that case, a municipality passed an ordinance granting the local solid waste utility a monopoly on collecting, removing, and disposing of solid waste in the municipality. See 241 F.3d at 1238. The ordinance further required that all waste be disposed of at the municipal facility. Id. The plaintiff, like the Building Owners here, operated a residential apartment complex and brought a Commerce Clause challenge because it desired more flexibility in disposing of its waste. See id. at 1237-38. Although the Ninth Circuit found that the plaintiff lacked prudential standing to challenge the collection monopoly of the ordinance (since collectors would have the possibility of using landfills outside the state, obviating Commerce Clause problems), it held that the plaintiff satisfied prudential standing requirements for challenging the section of the ordinance requiring all municipal garbage to be dumped at the municipal facility. See id. at 1239-41. The court reasoned that because plaintiff 's alleged injury would be remedied if it could take its garbage outside the city, its injury was related to the purposes underlying the Commerce Clause. See id. at 1241.

Like the plaintiffs in Huish Detergents and On the Green, we believe that the Building Owners satisfy prudential standing requirements because, as waste generators participating in commerce and directly affected by the fee imposed on them, they allege deprivations of their dormant Commerce Clause right to access interstate markets. See On the Green, 241 F.3d at 1240-41; Huish Detergents, 214 F.3d at 710-11.

The Waste Authority suggests, however, that no dormant Commerce Clause interest exists here because Montgomery County did not ban the Building Owners from gaining access to interstate garbage disposal markets, but merely imposed a fee. The Building Owners counter this argument by pointing out that it fails to consider how the WGF may effectively preclude access to the interstate garbage market by making it financially unfeasible to access it. This is an issue, however, which should be considered not now, as a part of our standing determination, but later with the merits of plaintiffs' claims.

11

The Waste Authority also asserts that, rather than follow On the Green and Huish Detergents, we should be guided by earlier Eighth and Ninth Circuit decisions in which waste generator plaintiffs, challenging waste disposal ordinances, were held to lack prudential standing. See Ben Oehrleins & Sons & Daughter, Inc. v. Hennepin County, 115 F.3d 1372, 1380–82 (8th Cir. 1997); Individuals for Responsible Gov't, Inc. v. Washoe County, 110 F.3d 669, 703–04 (9th Cir. 1997). However, these cases are distinguishable. In Washoe County, the Ninth Circuit Court of Appeals found that the individual consumers of trash disposal services did not have standing to claim a violation of the dormant Commerce Clause because they were not subjected to a barrier to interstate commerce, i.e., they had the option of disposing of their waste out of state. 110 F.3d at 703–04.

In Ben Oehrleins, the Eighth Circuit Court of Appeals held that the waste generator plaintiffs did not have standing to protest a cost of waste disposal that was an indirect cost, i.e., a cost that was passed on to the consumer by the waste haulers. 115 F.3d at 1381. In the cases before us, however, the WGF is imposed directly on the waste generators.4

The Waste Authority also contends that a finding of standing will greatly expand the scope of cognizable claims under the Commerce Clause, enabling any individual to challenge any state regulation no matter how remote the impact upon him or her. That concern is clearly not present here, however, because it is undisputed that the state regulation involved directly impacts the Building Owners. The Waste Authority funds the waste disposal scheme through a WGF directly assessed upon each of the Building Owners' properties. In challenging the legitimacy of this fee, the Building Owners' interests are hardly remote.

We conclude that, because the Building Owners have pled that they are unable to freely engage in the interstate market for waste processing and disposal services, their claims of injury fall within the zone of interests protected by

_____

4. We do not need to, and we will not, opine here whether we agree with the Ben Oehrleins court that waste generators do not have standing to complain of indirect costs passed on to them by the waste haulers.

12

the Commerce Clause. Accordingly, we find that the Building Owners satisfy the prudential requirements of standing to litigate their claims.5

III.

For the foregoing reasons, we will reverse the District Court's Rule 12(c) dismissals, which were premised on the Building Owners' lack of standing, and remand these cases for further proceedings consistent with this opinion.
_____

5. Although we find that the Building Owners have standing, we express no opinion on the merits of their Commerce Clause claims.

13

BARRY, Circuit Judge, dissenting.

I cannot agree with the majority that the Building Owners have demonstrated that their interests are arguably within the zone of interests intended to be protected by the Commerce Clause and, thus, that they have standing to bring their dormant Commerce Clause claim. The Building Owners did not participate in any interstate commerce decision -- where, for example, their waste was to be tipped -- and allege only that as a result of the "economic disincentives" that result from the zero tipping fee, the Waste Generation System interferes with their haulers' ability to participate in interstate commerce. It is, they say, an "obvious conclusion that the haulers will dispose of waste only where there is no tipping fee -- the[Montenay] Facility." Third Amended Comp., P 117. As a result, they continue, they are effectively compelled to dispose of their waste only at that local facility rather than at more affordable out-of-state facilities. This is simply not enough for a dormant Commerce Clause challenge, and I respectfully dissent.

The general dormant Commerce Clause cases as well as the more specific waste disposal dormant Commerce Clause cases discussed by the majority support my conclusion that in-state plaintiffs lack prudential standing to bring a dormant Commerce Clause claim where they allege only that a party with whom they contract is subject to an undue burden on its ability to freely participate in interstate commerce.1 In the"general" category, the Supreme Court has considered dormant Commerce Clause challenges brought by in-state companies whose ability to freely contract with out-of-state companies was directly infringed by a local regulation. See, e.g., Camps Newfound/ Owatonna, Inc. v. Town of Harrison, 520 U.S. 564 (1997) (in-state camp subject to state real and property tax waged successful dormant Commerce Clause challenge as it was the party against whom the tax was assessed and its ability to contract was directly burdened); General Motors Corp. v.

_____

1. In this connection, the argument that the haulers here -- who tip without payment of any fee -- are "burdened" at all is somewhat hard to understand.

14

Tracy, 519 U.S. 278 (1997) (in-state company subject to state sales and use tax had standing to bring dormant Commerce Clause challenge where it paid the tax and the tax scheme affected its contract with an out-of-state gas provider); West Lynn Creamery, Inc. v. Healy, 512 U.S. 186 (1994) (in-state milk producer waged a successful dormant Commerce Clause challenge where it was subject to a discriminatory tax and was a party to the transactions which were burdened). Although standing was not directly addressed in Camps and West Lynn, in all of these cases the in-state companies were within the "zone of interests" of the dormant Commerce Clause because they "sought to protect their own rights to purchase goods or do business across state borders, without being subject to a discriminatory tax." Ben Oehrleins and Sons and Daughter, Inc. v. Hennepin County, 115 F.3d 1372, 1381 (8th Cir. 1997).

Waste disposal cases from courts of appeals which have considered the issue have explicitly or implicitly come to the same conclusion. See On the Green Apartments L.L.C. v. City of Tacoma, 241 F.3d 1235 (9th Cir. 2001); Huish Detergents, Inc. v. Warren County, Kentucky, 214 F.3d 707 (6th Cir. 2000); Individuals for Responsible Gov't, Inc. v. Washoe County, 110 F.3d 699 (9th Cir. 1997); Ben Oehrleins, supra. In these cases, albeit for different reasons, the courts recognized a waste generator's standing to bring a dormant Commerce Clause claim where the waste generator alleged that its ability to contract directly with the hauler or processor of its choice was infringed by local regulation. On the Green and Huish Detergents, on which the majority relies, are two such cases. Where, however, the waste generator did not allege that its ability to contract directly with its hauler or processor of choice was infringed and instead asserted only that its injury was higher cost in-state services or some injury derivative of its hauler's injury, the waste generators were found to lack standing. Washoe County, supra; Ben Oehrleins , supra. Indeed, the On the Green Court relied on Washoe County when it found that the waste generator lacked standing with regard to its second claim, i.e. a claim of financial injury merely because it was forced to pay for unwanted services. Although the courts did not always articulate the importance of direct

15

involvement in the relevant interstate commerce decision and injury related to the dormant Commerce Clause, those considerations clearly run through each of these cases.

In Huish, for example, the Sixth Circuit held that the waste generator who was subject to a local regulation which required it to send all of its waste to a designated facility had standing because it sought "to protect its right to contract with a company that can transport its waste for out-of-state processing and/or disposal." Huish, 214 F.3d at 710-711 (emphasis added). The Huish Court also held that the waste generator's direct participation in the sought after out-of-state transaction distinguished Huish from the Sixth Circuit's decision in Ben Oehrleins. Id. at 711. In On the Green, standing was found as to a waste generator who was a self-hauler who alleged that it could not contract freely with out-of-state processors but, rather, was required to haul only to a city landfill. In contrast, in Washoe County and Ben Oehrleins -- and in the payment for unwanted services claim in On the Green -- the waste generators who lacked standing did not allege any direct participation in the subject interstate commerce decision and alleged only that they were subject to higher fees because of a local ordinance. While I do not contend that this is the only difference in these cases, it is a difference, I believe, of utmost importance to the standing question.

The Building Owners fall into the latter category. For starters, they do not allege that their ability to contract directly with the hauler of their choice -- even an out-of-state hauler -- is at issue in this case and, unlike the waste generators in Huish and On the Green, they are not, as the majority suggests, compelled to patronize the local market. Rather, the transaction at issue here is the processing decision -- where the waste ends up. The Building Owners claim that the haulers with whom they contract are put in an untenable position when they, the haulers, decide where to tip the waste -- "untenable" (although that hardly seems the right word) because they tip for free and thus it is "obvious" they will tip at the Montenay facility. The Building Owners do not allege any involvement in the decision making process to determine where their waste is tipped, nor do they allege that they seek to become self-haulers

16

and make this decision for themselves. Accordingly, even accepting the Building Owners' allegations as true, I conclude that any injury they suffer is derivative of their haulers' injury and they are one step removed from the interstate transaction or decision which is allegedly burdened. Their interests, therefore, are too marginally related to the purpose behind the dormant Commerce Clause for them to have standing.

Nor am I convinced, as the majority seems to be, that the Waste Generation Fee itself confers standing on the Building Owners. If this case were akin to Camps or General Motors, in which a party involved in the interstate decision was assessed a discriminatory tax, I would not be writing this dissent. Here, however, the Building Owners are merely consumers of hauling services who are subject to a flat fee for services they may not or do not want. Without even an allegation that they are also parties to the transaction or decision they claim is burdened or that their ability to contract directly with an out-of-state company is adversely affected, the injury of which the Building Owners complain is simply not within the zone of interests the Commerce Clause was intended to protect. I would affirm.

A True Copy:
Teste:

        Clerk of the United States Court of Appeals
        for the Third Circuit

17