OPINION OF THE COURT
FISHER, Circuit Judge.
Although Maher Terminals, LLC (“Maher”) challenges the rent it must pay under its lease agreement (“the Lease”) with the Port Authority of New York and New Jersey (“the Port Authority”), this case is not a typical landlord-tenant dispute. Maher, a landside marine terminal operator, asserts that the rent due under the Lease violates the U.S. Constitution’s Tonnage Clause, U.S. Const, art. I, § 10, cl. 3, as well as two related federal statutes, all of which historically have concerned taxes and fees imposed on vessels, their owners, and their passengers and crews. The District Court dismissed Maher’s complaint in its entirety, reasoning that Maher’s rent obligations did not violate the Tonnage Clause or its related statutes, and that Maher failed to establish admiralty jurisdiction for its remaining tort claim. We agree and hold that land-side service providers like Maher are not within the class of plaintiffs that the Tonnage Clause or its related federal statutes were intended to protect, that is, they are outside each law’s zone of interests. Accordingly, we will affirm.
I.
Maher is a marine terminal operator with its principal place of business in Elizabeth, New Jersey. Maher’s primary business is to load and unload cargo on vessels' — also known as stevedoring — and to berth vessels at its terminal. The Port Authority is an entity created by a compact between New York and New Jersey with the consent of Congress. The Port Authority oversees various transportation systems and, of most relevance to this appeal, the Port of New York and New Jersey, the third largest seaport in North America and the largest maritime cargo center on the eastern seaboard.[1]
The Port Authority leases many of its marine terminal facilities at the Port of New York and New Jersey to private companies like Maher, which in turn directly manage the terminals and provide steve-doring services to ships using those terminals. In October 2000, Maher signed a thirty-year lease with the Port Authority to rent the largest marine terminal at Port Elizabeth, consisting of 445 acres of improved land including structures and a berthing area.
The Lease divides Maher’s rent into two categories. First, the “Basic Rental” charges Maher a fixed rate per acre of the terminal. When the' complaint was filed in 2012, the Basic Rental was $50,413 per acre, totaling $22,433,612 for the year. The second form of rent — and this is the crux of the case — is the “Container Throughput Rental” (“Throughput Rental”), which is a variable charge based on the type and volume of cargo that is loaded and unloaded at Maher’s terminal. For the first eight years of the Lease’s term, Maher was exempted from paying any *103 Throughput Rental. Since 2008, the Throughput Rental has been calculated based on the following formula: the first 356,000 containers loaded and unloaded by Maher are exempted from any fees; for containers 356,001 to 980,000, Maher pays a per-container fee set forth by a schedule in the Lease ($19.00 per container when the complaint was filed); and for each container over 980,000, Maher pays a lower fee ($14.25 per container when the complaint was filed).
In addition, Maher must load and unload a minimum amount of cargo annually as a condition of maintaining the Lease (420,-000 containers when the complaint was filed, which is subject to increase to 900,-000 containers upon completion of certain harbor improvements), and Maher must pay an annual guaranteed minimum Throughput Rental equivalent to loading and unloading 775,000 containers (subject to the exemption for the first 356,000 containers), regardless of the number of containers Maher actually handles. All told, Maher paid roughly $12.5 million in Throughput Rental in 2010, and it expected the 2012 Throughput Rental to increase to $14 million.
According to Maher, the Port Authority profits from the Lease. The Port Authority also allegedly uses revenue from the Lease to fund harbor-improvement projects as well as projects wholly unrelated to the services that the Port Authority provides to Maher or vessels using the port.
In September 2012 — nearly twelve years after the Lease’s effective date — Maher sued the Port Authority in the U.S. District Court for the District of New Jersey. Maher’s complaint alleged violations of the U.S. Constitution’s Tonnage Clause, U.S. Const, art. I, § 10, cl. 3; the Rivers and Harbors Appropriation Act (“RHA”), 33 U.S.C. § 5(b); and the Water Resources Development Act (“WRDA”), 33 U.S.C. § 2236. Maher also asserted a negligence claim against the Port Authority for the way it established and collected fees.
The Port Authority moved to dismiss the complaint under Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure, and in July 2014, the District Court granted the motion. The District Court reasoned that Maher lacked standing to bring its Tonnage Clause and RHA claims because it was not a protected vessel. Even if Maher had standing, the Tonnage Clause and RHA claims still failed, the District Court held, because Maher did not adequately plead that any fees imposed on vessels were not for services rendered. The District Court also dismissed Maher’s WRDA claim because Maher had not shown that the Port Authority imposed fees on vessels or cargo and because the WRDA did not prohibit the Port Authority from using revenue from the Lease to finance harbor-improvement projects. Finally, the District Court decided that it lacked admiralty jurisdiction over Maher’s negligence claim and declined to exercise supplemental jurisdiction over the claim. Maher filed this timely appeal.[2]
II.
The District Court exercised jurisdiction only under 28 U.S.C. § 1331, concluding *104 that it lacked admiralty jurisdiction over Maher’s negligence claim under 28 U.S.C. § 1333(1) and declining to exercise supplemental jurisdiction over that claim under 28 U.S.C. § 1367. We have jurisdiction under 28 U.S.C. § 1291.
Regardless of whether the District Court dismissed Maher’s complaint for failure to state a claim or for lack of jurisdiction, our standard of review is the same: we exercise plenary review over the District Court’s order. Kaymark v. Bank of Am., N.A., 783 F.3d 168, 174 (3d Cir.2015) (failure to state a claim); Constitution Party of Pa. v. Aichele, 757 F.3d 347, 356 n. 12 (3d Cir.2014) (lack of jurisdiction, including lack of standing). And because any jurisdictional challenge here is facial, in either circumstance, we apply the same standard the District Court did, accepting as true the facts alleged in the complaint and drawing reasonable inferences in Maher’s favor. Kaymark, 783 F.3d at 174; Aichele, 757 F.3d at 356 n. 12, 358 (distinguishing facial attacks on jurisdiction from factual ones). We also may consider documents that are “integral to or explicitly relied upon in the complaint,” In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1426 (3d Cir.1997) (internal quotation marks omitted), such as the Lease here.
With respect to Maher’s negligence claim, we review the District Court’s determination of its own admiralty jurisdiction de novo, Sinclair v. Soniform, Inc., 935 F.2d 599, 601 (3d Cir.1991), but we review the Court’s refusal to exercise supplemental jurisdiction over state law claims for abuse of discretion, Figueroa v. Buccaneer Hotel Inc., 188 F.3d 172, 175 (3d Cir.1999).
III.
The central question on appeal is whether fees imposed on landside entities like Maher can support claims under the Tonnage Clause, the RHA, and the WRDA. A secondary question is whether the District Court correctly decided that it lacked admiralty jurisdiction, and declined to exercise supplemental jurisdiction over Maher’s negligence claim. We address these issues in turn.
A.
The U.S. Constitution prohibits states from “layfing] any Duty of Tonnage” without the consent of Congress. U.S. Const, art. I, § 10, cl. 3. Maher alleges that several fees imposed by the Lease, but principally the Throughput Rental, violate the Tonnage Clause.[3] Maher contends that the District Court incorrectly concluded that Maher lacked standing to bring a Tonnage Clause claim and that Maher did not adequately plead a violation of the Tonnage Clause.
Standing involves “constitutional limitations on federal-court jurisdiction” on the one hand and “prudential limitations” on the other. Warth v. Seldin, 422 U.S. *105 490, 498, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). Here the District Court concluded that Maher’s Tonnage Clause claim failed for lack of standing, but the Court did not explain whether its holding was based on constitutional or prudential limitations. We read the District Court’s opinion as relying on prudential limitations, not constitutional ones.[4] The District Court made no reference to the requirements of constitutional standing, instead explaining that Maher lacked standing because it was “not a vessel or other protected entity under the Tonnage Clause.” Maher Terminals, LLC v. Port Auth. of N.Y. & N.J., Civ. No. 2:126090 KM, 2014 WL 3590142, at *8 (D.N.J. July 21, 2014). In other words, the District Court concluded that Maher fell outside the class of plaintiffs who are protected by the Tonnage Clause. In so doing, the District Court effectively conducted a zone-of-interests analysis. See Lexmark Int’l, Inc. v. Static Control Components, Inc., — U.S. -, 134 S.Ct. 1377, 1387, 188 L.Ed.2d 392 (2014) (framing .the zone-of-interests test as asking whether a particular plaintiff “falls within the class of plaintiffs” authorized to sue under a particular law).
We have previously categorized the zone-of-interests requirement as one of three components of prudential standing. E.g., Freeman v. Corzine, 629 F.3d 146, 154 (3d Cir.2010).[5] But in Lexmark International, Inc. v. Static Control Components, Inc., the Supreme Court criticized the placement of the zone-of-interests requirement within the rubric of prudential standing. 134 S.Ct. at 1387 (“[Prudential' standing is a misnomer as applied to the zone-of-interests analysis.” (internal quotation marks omitted)); see also Shalom Pentecostal Church, 783 F.3d at 163 n. 7. The Court clarified that the zone-of-interests requirement goes to whether a particular plaintiff has a cause of action under a given law, not a plaintiffs standing. Lexmark, 134 S.Ct. at 1387. Though Lexmark was decided only a few months before the District Court’s decision in this case, we agree with Maher that Lexmark strongly suggests that courts shouldn’t link the zone-of-interests test to the doctrine of standing and that the District Court erred by apparently doing so here. But putting aside the label that applies to the zone-of-interests test, we agree with the District Court that Maher still must satisfy this test to state a Tonnage Clause *106 claim and, as explained below, that Maher fails the test.
' In applying the zone-of-interests test, we must discern the meaning and purpose of the Tonnage Clause using traditional methods of interpretation and ask whether it extends to Maher’s claim. Cf. id. at 1388-89 (analyzing the meaning and purposes of the Lanham Act to determine the interests protected by the Act). We have applied the zone-of-interests test “liberally]” and have noted “that it is not meant to be especially demanding.” Oxford Assocs. v. Waste Sys. Auth. of E. Montgomery Cnty., 271 F.3d 140, 146 (3d Cir.2001) (internal quotation marks omitted). The test is particularly generous in the context of challenges to agency actions under the Administrative Procedure Act, but it may be less so in other contexts. Lexmark, 134 S.Ct. at 1389.
Turning to the Tonnage Clause’s meaning, “we are guided by the principle that the Constitution was written to be understood by the voters; its words and phrases were used in their normal and ordinary as distinguished from technical meaning.” District of Columbia v. Heller, 554 U.S. 570, 576, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008) (internal quotation marks and brackets omitted). Although the Constitution appears to speak broadly by prohibiting states from “lay[ing] any Duty of Tonnage,” the term “Duty of Tonnage” had a well-known meaning to the founding generation. It referred to the common commercial practice of taxing “a ship ... according to ‘the internal cubic capacity of a vessel,’ i.e., its tons of carrying capacity.” Polar Tankers, Inc. v. City of Valdez, 557 U.S. 1, 6, 129 S.Ct. 2277, 174 L.Ed.2d 1 (2009) (quoting Clyde Mallory Lines v. Alabama ex rel. State Docks Comm’n, 296 U.S. 261, 265, 56 S.Ct. 194, 80 L.Ed. 215 (1935)). Further, tonnage duties referred to taxes “on the privilege of access by vessels to the ports of a state” and “were distinct from fees ... for services facilitating commerce.” Clyde Mallory Lines, 296 U.S. at 265, 56 S.Ct. 194.
To the Framers, the Tonnage Clause supported and shared a purpose with the Import-Export Clause, U.S. Const. art. I, § 10, cl. 2, which generally prohibits states from taxing imports and exports. See Clyde Mallory Lines, 296 U.S. at 264-65, 56 S.Ct. 194. The purpose of the Import-Export Clause, in turn, was to prevent states with convenient ports from taxing goods travelling in commerce at the expense of consumers in less-fortunately located states. See Polar Tankers, 557 U.S. at 7, 129 S.Ct. 2277. The Framers understood that the ImporNExport Clause could be effectively “nullified” “[i]f the states had been left free to tax the privilege of access by vessels to their harbors.” Clyde Mallory Lines, 296 U.S. at 265, 56 S.Ct. 194; accord S.S. Co. v. Portwardens, 73 U.S. (6 Wall.) 31, 34-35, 18 L.Ed. 749 (1867). Although there was some disagreement about whether the Commerce Clause already prohibited tonnage duties, Clyde Mallory Lines, 296 U.S. at 265 n. 1, 56 S.Ct. 194, the Tonnage Clause was adopted to “prevent that nullification” and to further restrain states from obtaining “geographical vessel-related tax advantages,” Polar Tankers, 557 U.S. at 7, 129 S.Ct. 2277.
To effectuate these purposes, the Supreme Court has interpreted the Tonnage Clause to prohibit more than only classic tonnage duties, i.e., taxes on a ship based on the ship’s capacity; the Court has also said that a state cannot “ ‘do that indirectly which she is forbidden ... to do directly.’ ” Id. at 8, 129 S.Ct. 2277 (alteration in original) (quoting Passenger Cases, 48 U.S. (7 How.) 283, 458, 12 L.Ed. 702 (1849)). Thus, the Tonnage Clause prohibits taxes that vary according to ratios oth *107 er than a ship’s capacity, such as the number of masts, mariners, or passengers. Id. It likewise prohibits taxes that are imposed not just on the vessel itself but also on the ship captain, owner, supercargo (the person in charge of the cargo on the ship), and passengers. Id.; Passenger Cases, 48 U.S. (7 How.) at 458-59. The Clause even prohibits flat taxes on a ship — those that do not vary according to tonnage — if they are for the privilege of entering a port. Portwardens, 73 U.S. (6 Wall.) at 34-35. In sum, the Tonnage Clause’s prohibition “embrace[s] all taxes and duties regardless of their name or form, and even though not measured by the tonnage of the vessel, which operate to impose a charge for the privilege of entering, trading in, or lying in a port.” Clyde Mallory Lines, 296 U.S. at 265-66, 56 S.Ct. 194.
Consistent with the original understanding of tonnage duties, the Tonnage Clause does not prohibit states from charging vessels “for services rendered to and enjoyed by the vessel, such as pilot-age, or wharfage, or charges for the use of locks on a navigable river, or fees for medical inspection.” Id. at 266, 56 S.Ct. 194 (citations omitted). Charges for such services, even those that vary according to tonnage, are constitutional for at least two reasons. First, they are not taxes — which are assertions of sovereignty — but are instead demands for reasonable compensation — which are assertions of a right of property. Packet Co. v. Keokuk, 95 U.S. 80, 85, 24 L.Ed. 377 (1877). Second, charges for services are constitutional because they facilitate, rather than impede, commerce. See Clyde Mallory Lines, 296 U.S. at 265-66, 56 S.Ct. 194; Keokuk, 95 U.S. at 84 (“[A charge for services rendered] is not a hindrance or impediment to free navigation.”).
Of course, a state may not escape the Tonnage Clause’s reach merely by labelling a tax as a charge for services. Keokuk, 95 U.S. at 86; Cannon v. City of New Orleans, 87 U.S. (20 Wall.) 577, 580, 22 L.Ed. 417 (1874) (“A tax which is ... due from all vessels arriving and stopping in a port, without regard to the place where they may stop, ... cannot be treated as a compensation for the use of a wharf.”). Vessels that pay a purported services charge must actually receive a proportionate benefit in return. See State Tonnage Tax Cases, 79 U.S. (12 Wall.) 204, 220, 20 L.Ed. 370 (1870) (striking down a tax because it was “an act to raise revenue without, any corresponding or equivalent benefit or advantage to the vessels taxed”). So it is constitutional for a state to demand “just” and “reasonable compensation” for services rendered, Cannon, 87 U.S. (20 Wall.) at 582, but the inverse must also be true: a state may not demand unjust and unreasonable compensation for services, even if services are actually rendered. Additionally, a reasonable charge for general services that benefit all ships that enter a port, such as policing services for a harbor, is constitutional, see Clyde Mallory Lines, 296 U.S. at 266-67, 56 S.Ct. 194, but a tax that has a “general, revenue-raising purpose” is probably not, see Polar Tankers, 557 U.S. at 10, 129 S.Ct. 2277.
From this discussion, we conclude that the Tonnage Clause was meant to protect vessels as vehicles of commerce. See Keokuk, 95 U.S. at 84-85 (“[The Tonnage Clause] was designed to guard against local hindrances to trade and carriage by vessels....” (emphasis added)). Tonnage duties were originally understood as taxes on vessels, and the modern formulation from Clyde Mallory Lines and Polar Tankers extending the Clause to all “charge[s] for the privilege of entering, trading in, or lying in a port” does nothing to change the fundamental object of the provision. The body of law surrounding *108 the services exception to the Tonnage Clause drives home the point. Fees for services are allowed because they do not impede a vessel’s free navigation in commerce and are only levied when a “passing vessel” elects to use those services, see Keokuk, 95 U.S. at 85, a concern that is plainly inapplicable to non-vessel plaintiffs. Therefore, to come within the Tonnage Clause’s zone of interests, we hold that a plaintiff must allege an injury to a vessel as a vehicle of .commerce.
Our conclusion does not conflict with the Supreme Court’s admonition that the Tonnage Clause prohibits indirect tonnage duties and, consequently, extends to taxes imposed not only on a vessel, but also on an owner, ship captain, supercargo, or the passengers; to the contrary, the two are very much consistent. Though these people are obviously not ships, the Tonnage Clause prohibits taxes imposed on them because they are representatives of ships. See Passenger Cases, 48 U.S. (7 How.) at 458 (“It is ... a duty on the vessel.... It is a taxation of the master, as representative of the vessel and her cargo.”). And unlike the landside provider of harbor services, these people travel with the ships moving as vehicles in commerce. As discussed above, the Tonnage Clause protects the rights of vessels to navigate free of local hindrances by prohibiting charges that the vessels do not choose to incur. Just as a tax on a vessel impedes the vessel’s ability to freely move in commerce, taxes on the people on board the vessel have the same effect. Taxes on certain people (the owner, captain, supercargo, and crew) directly impact where a vessel decides to make port by taxing those responsible for the vessel’s navigation, and taxes on passengers will likely indirectly impact a vessel’s decisions by reducing demand for passage on the vessel. The interests of these people are the same as the interests of the vessels they occupy, so the Tonnage Clause prohibits taxes on them just as it prohibits taxes on the vessels themselves.
As a landside marine terminal operator challenging the rent it owes under the Lease, Maher is not a member of the class of plaintiffs that can state a claim under the Tonnage Clause. Maher’s injury is not an injury to a vessel or its representative. Unlike a fee imposed on a vessel or the people on board, a fee imposed on Maher does not in and of itself impact a vessel’s ability to freely navigate in commerce. Fees imposed on Maher affect vessels only if Maher passes on such fees to vessels that use its terminal for stevedoring services. That it is not enough for Maher to satisfy the zone-of-interests test. A party may not contract its way into a law’s zone of interests if that party does not itself have any protected interests under the law. Cf. Freeman, 629 F.3d at 157 (“[Plaintiffs who allege only that a party with whom they contract is subject to an undue burden on its ability to freely participate in interstate commerce are not within the zone of interests protected by the dormant Commerce Clause.” (internal'quotation marks omitted)). To hold otherwise would allow parties to evade the first prudential standing requirement: that parties must assert their own legal interests, not the interests of third parties. See id. at 154. Therefore, the Tonnage Clause is not concerned with taxes on any entity that has some relationship with vessels; rather, it prohibits taxes that are directed at vessels or their representatives. Vessels may be able to challenge Maher’s rent,[6] but Maher cannot *109 assert the rights of. third-party vessels.[7]
We are unpersuaded by Maher’s argument that it satisfies the zone-of-interests test because it is “engaged in interstate commerce” and “seek[s] to vindicate interests related to the protection of interstate commerce.” Maher Br. 32 (alteration in original) (internal quotation marks omitted). For support, Maher relies on cases applying the zone-of-interests test in the context of the dormant Commerce Clause. See Freeman, 629 F.3d at 156-57;. Oxford Assocs., 271 F.3d at 146. Though the Tonnage Clause supports the Commerce Clause (as well as the Import-Export Clause), the Tonnage Clause is not the Commerce Clause. The Tonnage Clause protects the free flow of commerce through a specific means — by protecting vessels operating as vehicles of commerce.
Nor is Maher within the Tonnage Clause’s zone of interests because it pays fees that vary according to the volume of cargo moving through its port. In Polar Tankers, the Supreme Court said that the tax at issue there was “at the heart of what the Tonnage Clause forbids.” 557 U.S. at 10, 129 S.Ct. 2277. It did so in part because the tax “depend[ed] on a factor related to tonnage,” i.e., a ship’s cargo capacity, in that it applied to vessels only of a certain size. Id. But other cases teach us that whether a fee varies according to tonnage is not actually the touchstone of unconstitutional tonnage duties. See Clyde Mallory Lines, 296 U.S. at 265-66 (holding that the Tonnage Clause prohibits “all taxes aiid duties regardless of their name or form, and even though not measured by the tonnage of the vessel, which operate to impose a charge for the privilege of entering, trading in, or lying in a port” (emphasis added)); Portwardens, 73 U.S. (6 Wall.) at 35 (holding that the Tonnage Clause prohibits “fixed” fees as well as fees that vary with vessels’ capacity (emphasis added)). We therefore do not read Polar Tankers or any of the Tonnage Clause precedent as standing for the proposition that any fee on anyone or anything that varies according to cargo volume is an unconstitutional tonnage duty, as Maher does. What actually made the tax in Polar Tankers unconstitutional, and what Maher cannot show here, is that the tax was directed at vessels and was not in exchange for services. See 557 U.S. at 10, 129 S.Ct. 2277 (noting that “the tax applied] only to large ships” and was “not for services provided to the vessel[s]”). The same is true of Bridgeport & Port Jefferson Steamboat Co. v. Bridgeport *110 Port Authority, where the Second Circuit struck down a fee imposed on all passengers of a ferry under the Tonnage Clause. 567 F.3d 79, 88 (2d Cir.2009). Although the tax in Bridgeport varied depending on whether the passenger was a person or vehicle, the tax was unconstitutional, in our view, because it was directed at a vessel’s passengers.
If we unmoor the Tonnage Clause from taxes on vessels and allow landside entities to bring Tonnage Clause claims, we would transform the Tonnage Clause into a broad “Maritime Commerce Clause.” Landside entities having some relationship to maritime commerce would be able to challenge not only volumetric charges like the one here, but any unreasonable state-imposed fees for the privilege of being in a port. See Portwardens, 73 U.S. (6 Wall.) at 35 (“It was not only a pro rata tax which was prohibited, but any duty....”). So, for example, a restaurant renting state property in a port that serves food to mariners fresh off a vessel could state a claim under the Tonnage Clause by claiming that its rent is unreasonably high given the services provided by the state. We doubt the Framers intended the Tonnage Clause to sweep so broadly as to transform these and other landlord-tenant disputes into constitutional questions, especially given the conspicuous absence of vessels and cargo owners from this case complaining about the fees they are paying at the Port of New York and New Jersey.[8] Although the Tonnage Clause should be interpreted in light of its general purposes of preventing nullification of the Import-Export Clause and stopping states from obtaining geographic advantages by taxing vessels, these purposes do not give us license to transform the Tonnage Clause into something it is not and was never intended to be.
In sum, while we hold that the District Court should not have couched its conclusion in terms of standing after Lexmark, we agree with the District Court’s essential holding: Maher, as a landside entity, is outside the Tonnage Clause’s zone of interests. This is not, as Maher contends, to elevate ' form over substance. Anchoring the Tonnage Clause to taxes on vessels and their representatives is the only way to preserve the Clause’s meaning. Accordingly, Maher failed to state a Tonnage Clause claim.
B.
Maher next challenges the District Court’s dismissal of its RHA claim. Under the RHA, taxes and fees from non-Federal interests (like the Port Authority) cannot be “levied upon or collected from any vessel or other water craft, or from its passengers or crew,” except for, inter alia, “reasonable fees charged on a fair and equitable basis that — (A) are used solely to pay the cost of a service to the vessel or water craft; (B) enhance the safety and efficiency of interstate and foreign commerce; and (C) do not impose more than a small burden on interstate or foreign commerce.” 33 U.S.C. § 5(b).
By its terms, the RHA only applies to taxes and fees imposed on or collected from vessels, their passengers, or their crews. As a landside terminal, Maher is none of these and therefore cannot *111 state a claim under the RHA. Maher itself recognizes that the RHA codifies the body of law surrounding the Tonnage Clause. Accordingly, we hold that Maher’s RHA claim fails for the same reasons as its Tonnage Clause claim, and for the additional reason that the plain language of the RHA is explicitly limited to categories of entities that do not include Maher.
C.
We also reject Maher’s argument that the District Court incorrectly dismissed its WRDA claim. The WRDA grants the consent of Congress to certain tonnage duties and cargo fees to finance harbor-improvement projects provided that such fees are imposed in accordance with the WRDA’s requirements. 33 U.S.C. § 2236(a). Among other things, the WRDA permits the collection of fees only after the project has been completed. Id. § 2236(a)(1). Before fees may be imposed under the WRDA, there must be notice and a public hearing on the proposed fees, id. § 2236(a)(5), and the non-Federal interest must publicly file a schedule of harbor fees with the Federal Maritime Commission, id. § 2236(a)(6)(A). The WRDA allows “[a]ny person who ... is ... aggrieved by ... a proposed scheme or schedule of port or harbor dues under this section ... to seek judicial review of that proposed scheme or schedule,” provided that the action is brought within 180 days of the hearing required by § 2236(a)(5). Id. § 2236(b)(2).
Maher’s WRDA claim fails for two reasons. First, the WRDA expressly applies only to fees imposed on vessels and on cargo. Here Maher is challenging neither. Granted, the Lease calculates Maher’s rent based in part on the amount of cargo moving through Maher’s terminal, but Maher’s rent is not a fee on the cargo itself. Nor is it a tonnage duty, as explained above.
Second, we agree with the Port Authority that Maher has no WRDA claim because the Port Authority never even purported to impose rent on Maher pursuant to the WRDA. The WRDA provides a limited private right of action to persons “aggrieved by ... a proposed scheme or schedule of port or harbor dues under this section” and only allows for “judicial review of that proposed scheme or schedule.” Id. § 2236(b)(2) (emphasis added). Additionally, the 180-day time limit for bringing a WRDA claim is tied to the date of the public hearing required by the WRDA. Id. Because there is no WRDA schedule of fees for us to review, Maher has no WRDA claim.
Maher argues that such a reading of the WRDA is “preposterous,” Maher Reply Br. 21, but we disagree. Nothing in the WRDA prohibits non-Federal interests from raising revenue in ways other than tonnage duties and cargo fees to finance harbor-improvement projects, as the Port Authority is allegedly doing in this case. Moreover, the WRDA merely provides congressional consent to tonnage duties and cargo fees that meet the WRDA’s other requirements. In other words, it is a safe harbor for what would otherwise be unconstitutional duties. If a non-Federal interest imposes tonnage duties or cargo fees that do not comport with the WRDA’s requirements, those duties and fees would not have the consent of Congress, and the remedy would be a direct challenge under the Tonnage Clause or the Import-Export Clause.
Therefore, we hold that Maher cannot state a claim under the WRDA.
D.
Finally, we address Maher’s negligence claim. The District Court concluded that it lacked federal admiralty jurisdiction *112 over the claim under 28 U.S.C. § 1333(1) and declined to exercise supplemental jurisdiction over the claim under 28 U.S.C. § 1367.
A proponent of admiralty jurisdiction for “a tort claim must satisfy conditions both of location, and of connection with maritime activity.” Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co., 513 U.S. 527, 534, 115 S.Ct. 1043, 130 L.Ed.2d 1024 (1995). To satisfy the location test, “the tort [must have] occurred on navigable water or ... [an] injury suffered on land [must have been] caused by a vessel on navigable water.” Id. “[T]he tort occurs where the alleged negligence took effect.” Exec. Jet Aviation, Inc. v. City of Cleveland, 409 U.S. 249, 266, 93 S.Ct. 493, 34 L.Ed.2d 454 (1972) (internal quotation marks omitted).
Maher’s claim of negligence is that the Port Authority “negligently estab-' lish[ed] and collected] charges and fees for the use of Maher’s terminal ... upon such bases and in such amounts as are unlawful.” J.A. 49. Put simply, any negligence by the Port Authority occurred on land. Maher and the Port Authority are land-based entities. The Lease was negotiated on land, and payments were made on land. Accordingly, Maher cannot satisfy the location test for admiralty jurisdiction, so its claim arises not under federal law but state law.
And because the District Court correctly dismissed all of Maher’s federal claims over which it possessed original jurisdiction, the District Court did not abuse its discretion when it declined to exercise supplemental jurisdiction over Maher’s state-law negligence claim. See Hedges v. Musco, 204 F.3d 109, 123 (3d Cir.2000) (discussing 28 U.S.C. § 1367(c)(3)).
IV.
For the reasons set forth above, we will affirm the order of the District Court.[9]

. Individual appellee Patrick Foye is the Port Authority’s Executive Director.

. While Maher has been litigating this case, it has also been disputing the Lease’s terms before the Federal Maritime Commission. See Maher Terminals, LLC v. Port Auth. of N.Y. & N.J., No. 08-03, 2014 WL 7328474 (FMC Dec. 17, 2014). The FMC concluded that the Port Authority did not violate the Shipping Act, 46 U.S.C. § 40101, by giving an unreasonable preference to another terminal or imposing an unreasonable prejudice on Maher based on the terms of the Lease, including the minimum Throughput Rental. Id. at *1, *24.

. On appeal, Maher also challenges the Cargo Facility Charge ("CFC”), which requires "a user of cargo handling services” to pay a fee • "to the Port Authority, which will be collected by the terminal operator handling the user’s cargo [i.e., Maher] for remittance to the Port Authority.” J.A. 345. The Port Authority correctly points out that Maher's complaint only obliquely refers to the CFC, and that Maher did not raise the CFC before the District Court. At oral argument, counsel for Maher argued that the minimum volumetric guarantee, which we understand to be part of the Throughput Rental, also violates the Tonnage Clause. As explained below, however, the categories of fees challenged by Maher are ultimately unimportant because they do not change the fact that Maher is not a vessel or its representative and therefore cannot state a claim under the Tonnage Clause, the RHA, or the WRDA.

. In any event, we have no trouble concluding that Maher has constitutional standing' to bring its claims. “Constitutional standing has three elements: injury in fact, causation, and redressability.” Shalom Pentecostal Church v. Acting Sec'y U.S. Dep’t of Homeland Sec., 783 F.3d 156, 161 (3d Cir.2015) (citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61, 112 S.Ct 2130, 119 L.Ed.2d 351 (1992)). Here the Port Authority argues that Maher suffers no injury in fact from fees that Maher passes on to vessels. This argument is unpersuasive. Maher is responsible for the fees regardless of whether it passes them on to vessels. See Bacchus Imps., Ltd. v. Dias, 468 U.S. 263, 267, 104 S.Ct. 3049, 82 L.Ed.2d 200 (1984) (concluding that wholesalers had alleged an economic injury caused by a tax that they were liable to pay even if they could pass on the tax to customers). This conclusion applies to all of Maher's claims. To the extent the District Court's analysis was based on constitutional standing, see Maher Terminals, LLC v. Port Auth. of N.Y. & N.J., Civ. No. 2:12-6090 KM, 2014 WL 3590142, at *8 & n. 11 (D.N.J. July 21, 2014) (discussing Rule 12(b)(1) dismissal), the District Court was wrong. Still, we may affirm on any grounds supported by the record. Tourscher v. McCullough, 184 F.3d 236, 240 (3d Cir.1999).

. The other two components of prudential standing are that a plaintiff first must "assert his or her own legal interests rather than those of third parties,’-' and second must not assert "generalized grievances” that require courts to "adjudicate] abstract questions.” Freeman, 629 F.3d at 154 (internal quotation marks and brackets omitted).

. We do not hold that vessels or their representatives could never challenge tonnage duties that are passed through a private entity like Maher.

. Although third-party standing — standing to assert the legal interests of third parties — is allowed in "exceptional” circumstances, Amato v. Wilentz, 952 F.2d 742, 750 (3d Cir.1991), Maher did not seek third-party standing here, mostly because it did not believe it needed to allege that the vessels paid the tonnage duties in this case. But even if Maher had made a third-party standing argument, it would have failed. In deciding whether Maher should have third-party standing, we consider, inter alia, (1) whether Maher had a close relationship with the third-party vessels and (2) whether the third-party vessels faced some obstacles to bringing their own lawsuits. See Pa. Psychiatric Soc’y v. Green Spring Health Servs. Inc., 280 F.3d 278, 288-89 (3d Cir.2002). Maher does not appear to have the requisite close relationship with the allegedly-injured vessels. Fifteen years ago, Maher agreed to the Throughput Rental that it now claims violates the vessels' rights under the Tonnage Clause. Additionally, there are limited obstacles to vessels asserting their own claims under the Tonnage Clause if they believe they are paying unconstitutional tonnage duties. Finally, and perhaps most fundamentally, it is unclear from Maher's complaint whether any vessels are actually paying unconstitutional tonnage duties. Maher’s allegations about passing on the fees to the vessels are quite vague, and Maher does not adequately allege that the vessels are paying unreasonable fees for the services they receive from Maher (the services provider) as a result of the rent due under the Lease.

. State, Department of Natural Resources v. Alaska Riverways, Inc., 232 P.3d 1203 (Alaska 2010), is not to the contrary. There the Alaska Supreme Court struck down a per-passenger fee under the RHA that was assessed against a boat company ostensibly as rent for using unimproved shoreland. Id. at 1221. Unlike the plaintiff in that case, Maher is not a vessel operator so it does not have any independent interests protected by the Tonnage Clause or the RHA, its statutory equivalent.

. Based on our resolution of the case on the above-stated grounds, we do not reach the Port Authority’s alternative arguments that Maher’s claims are untimely.