**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 15-3635
_____

GREG HARGUS

v.

FEROCIOUS AND IMPETUOUS, LLC;
KYLE COLEMAN; JOSEPH TRATTNER;
ST. THOMAS SPORT AND SOCIAL CLUB;
M/V ONE LOVE

Kyle Coleman; M/V One Love,
                              Appellants
_____

On Appeal from the District Court
of the Virgin Islands
(D.V.I. No. 3-13-cv-00111)
District Judge: Honorable Ruth Miller
_____

Argued May 19, 2016
_____

Before: FUENTES, VANASKIE, and RESTREPO, *Circuit
Judges*

(Filed: October 18, 2016)

Matthew J. Duensing      [ARGUED]
5060 Fort Straede, Electra House, P.O. Box 6785
St. Thomas, United States Virgin Islands 00802
     *Counsel for Appellants*

_____

OPINION

_____

VANASKIE, *Circuit Judge.*

Appellants Kyle Coleman and the M/V One Love (the "One Love")[1] appeal the District Court's judgment in favor of Appellee Greg Hargus on his negligence claim following a bench trial. For the reasons discussed below, we conclude that the tortious act giving rise to Hargus' claim was insufficient to invoke maritime jurisdiction because the act was not of the type that could potentially disrupt maritime commerce. Therefore, the District Court lacked subject matter jurisdiction over Hargus' personal injury claim. Accordingly, we will vacate the judgment of the District Court and remand the matter with instructions that the District Court dismiss the case.

---

[1] The One Love is a twenty-six foot recreational vessel.

2

I.

On May 19, 2012, Hargus and a group of individuals rented the One Love to travel from St. Thomas to various destinations throughout the United States Virgin Islands.[2] Ferocious and Impetuous, LLC ("F&I") owned the One Love and had hired Coleman as a captain. One of the stops on the tour was Cruz Bay, St. John, where Coleman anchored the One Love in "knee deep" water close to the shore. (App. 30, 271.) Most of the passengers then disembarked from the One Love. Later in the day, two members of the group—who were standing on the beach approximately 25 feet away from the One Love—threw beer cans at Hargus while he was standing on the deck of the anchored One Love. Upon seeing this, Coleman, who was standing on the beach next to the other two individuals, threw an empty insulated plastic coffee cup at Hargus. The plastic cup hit Hargus in the temple on the left side of his head. Hargus, however, did not lose consciousness and did not complain of any injury at that time. One Love resumed its journey without further incident.

On May 21, 2012, two days after the incident, Hargus, who had experienced pain and vision impairments after being hit by the coffee cup, sought medical attention. He was diagnosed with a concussion and a mild contusion.[3] The treating physician did not prescribe any medication and

---

[2] The factual recitation is based largely upon the Findings of Fact made by the District Court following the Bench Trial. (App. 29-33.)

[3] Hargus had a history of head trauma, having previously suffered 10 to 12 head injuries or concussions.

allowed Hargus to return to work that day without restrictions.

Hargus did not seek further medical treatment until more than a year later. From June of 2013 until October of 2013, he was examined by at least three doctors for complaints of headaches, memory loss, mood swings, and neck pain. He last sought treatment for his headaches and other symptoms in October of 2013.

On November 20, 2013, Hargus filed the instant lawsuit in the District Court of the Virgin Islands against Coleman, F&I, Joseph Trattner (owner of F&I), Brent Hazzard, St. Thomas Sport and Social Club, and the One Love, *in rem*. In his Amended Complaint, Hargus asserted five claims: (1) a maritime lien against the One Love; (2) negligence and negligent entrustment against F&I, Trattner, Hazzard, and the St. Thomas Sport and Social Club; (3) negligence against Coleman; and (5) vicarious liability against F&I, Trattner, Hazzard, and the St. Thomas Sport and Social Club. The District Court held a two-day bench trial on Hargus' claims on February 24 and 25, 2015.

On September 30, 2015, the District Court issued its opinion, explaining that it had admiralty jurisdiction over Hargus' claims because "[c]laims such as these for personal injury to the passenger of a vessel caused by the captain of the vessel meet the situs and nexus requirements for admiralty tort jurisdiction of this Court." (App. 44.) The District Court further concluded that Coleman was negligent and that the One Love was jointly and severally liable *in rem*. However, the District Court found that F&I and Trattner were not liable for negligence or negligent entrustment and were not vicariously liable. Thereafter, the District Court entered

4

judgment in favor of Hargus and against Coleman and the One Love, jointly and severally, in the amount of $50,000. Coleman and the One Love timely filed this appeal.[4]

II.

We have appellate jurisdiction to review a final order of the District Court under 28 U.S.C. § 1291. We exercise de novo review over the District Court's determination of its own admiralty jurisdiction. *Maher Terminals, LLC v. Port Auth. of N.Y. & N.J.*, 805 F.3d 98, 104 (3d Cir. 2015); *Sinclair v. Soniform, Inc.*, 935 F.2d 599, 601 (3d Cir. 1991).

Under the United States Constitution, the federal judicial power encompasses "all Cases of admiralty and maritime Jurisdiction." U.S. Const. art. III, § 2, cl. 1. Congress codified that jurisdiction at 28 U.S.C. § 1333(1), which provides that federal district courts have original jurisdiction over "[a]ny civil case of admiralty or maritime jurisdiction." 28 U.S.C. § 1333(1). "The fundamental interest giving rise to maritime jurisdiction is 'the protection of maritime commerce.'" *Sisson v. Ruby*, 497 U.S. 358, 367 (1990) (quoting *Foremost Ins. Co. v. Richardson*, 457 U.S. 668, 674 (1982)).

When a party seeks to invoke federal admiralty jurisdiction over a tort claim, the claim "must satisfy conditions both of location and of connection with maritime activity." *Jerome B. Grubart, Inc. v. Great Lakes Dredge &*

---

[4] It bears noting that no entry of appearance was made on behalf of Hargus. Nor was a brief filed on his behalf and neither Hargus nor an attorney acting on his behalf participated in oral argument.

5

*Dock Co*., 513 U.S. 527, 534 (1995). The location aspect is satisfied if "the tort occurred on navigable water" or the "injury suffered on land was caused by a vessel on navigable water." *Id*. The connection aspect is a conjunctive two-part inquiry. First, we "must 'assess the general features of the type of incident involved' to determine whether the incident has 'a potentially disruptive impact on maritime commerce.'" *Id.* (quoting *Sisson*, 497 U.S. at 363, 364 n.2). Second, we "must determine whether 'the general character' of the 'activity giving rise to the incident' shows a 'substantial relationship to traditional maritime activity.'" *Id.* (quoting *Sisson*, 497 U.S. at 364 n.2, 365). Federal admiralty jurisdiction is only proper when the location test and both prongs of the connection test are satisfied. *Id*.

Here, even assuming the location test is satisfied, we find that admiralty jurisdiction is lacking because the first prong of the connection test is not met. The first prong of the connection test analyzes whether "the general features of the type of incident involved" have "a potentially disruptive impact on maritime commerce." *Id.* (quoting *Sisson*, 497 U.S. at 363, 364 n.2). This analysis requires us to assess the "potential" disruptive effects that the type of incident involved could have on maritime commerce, not whether the particular incident at hand actually disrupted maritime commerce. *Id*. at 538–39. In so doing, we must describe the incident "at an intermediate level of possible generality." *Id*. at 538. The purpose of this exercise is to ascertain "whether the incident could be seen within a class of incidents that posed more than a fanciful risk to commercial shipping." *Id*. at 539.

Several cases illustrate the proper analysis. In *Sisson*, a fire broke out on a recreational vessel that was docked at a

marina, destroying that vessel and damaging several recreational vessels nearby and the marina. 497 U.S. at 360. The Supreme Court described the incident as "a fire on a vessel docked at a marina on navigable waters," and concluded that this type of incident has the potential to disrupt maritime commerce because the fire could have spread to a nearby commercial vessel or made the marina inaccessible for commercial vessels. *Id*. at 362-63.

Likewise, in *Grubart,* a construction company that was using a crane on a barge in the Chicago River allegedly cracked a freight tunnel running under the river, causing water to pour into the tunnel and flood buildings downtown. 513 U.S. at 530. The Supreme Court described that incident as "damage by a vessel in navigable water to an underwater structure," and concluded that this type of incident has the potential to disrupt maritime commerce because it "could lead to a disruption in the water course itself" or "could lead to restrictions on the navigational use of the waterway during required repairs." *Id*. at 539; *see also Foremost Ins. Co.*, 457 U.S. at 675 (describing a collision between two pleasure boats as "a collision between boats on navigable water" and concluding that such an incident has the potential to disrupt maritime commerce because a collision between boats in an area with heavy commercial boat traffic would have a "substantial effect on maritime commerce"); *id.* at 675 n.5 (explaining that, in *Executive Jet Aviation, Inc. v. City of Cleveland*, 409 U.S. 249 (1972), the Supreme Court concluded that a plane crashing into the water had the potential to disrupt maritime commerce because "an aircraft sinking in the water could create a hazard for the navigation of commercial vessels in the vicinity").

On the other hand, in *Tandon v. Captain's Cove Marina of Bridgeport, Inc.*, 752 F.3d 239 (2d Cir. 2014), the court concluded that a brawl on a permanent floating dock between passengers of two boats did not have the potential to disrupt maritime commerce. In that case, two separate groups of individuals (the "Tandon group" and the "Genna group") traveled by separate boats to a marina restaurant for dinner and drinks. *Id.* at 241. As both groups left the restaurant and boarded their boats, a member of the Tandon group fell into the water. *Id*. Members of the Genna group laughed at the mishap, leading members of the Tandon group to yell unspecified comments in response. *Id*. Both groups then proceeded by boat to the South Dock—a floating dock accessible only by water—and docked their respective vessels. *Id*. at 242. Once both groups disembarked from their vessels onto the South Dock, a fistfight broke out, during which one member of the Genna group was knocked off the South Dock and into the water. *Id.* The individual also alleged that he was then held underwater to the point of asphyxia and suffered severe injuries as a result. *Id*.

In analyzing the potential for this type of incident to disrupt maritime commerce, the Second Circuit described the incident as "a physical altercation among recreational visitors on and around a permanent dock surrounded by navigable water." *Id*. at 249. The Court explained that, unlike *Grubart*, this type of incident cannot disrupt navigation because "it does not create any obstruction to the free passage of commercial ships along navigable waterways. Nor can it lead to a disruption in the course of the waterway itself." *Id*. Furthermore, the Court noted that, unlike *Sisson*, this incident "cannot immediately damage nearby commercial vessels" and "threatens only its participants." *Id*. Moreover, the Court

8

found that because the incident did not occur while the parties were at sea, the incident could not "distract the crew from their duties, endangering the safety of the vessel and risking collision with others on the same waterway" or force the vessel "to divert from its course to obtain medical care for the injured person." *Id.* at 250. Finally, the Court noted that the injured individual was not "employed in maritime commerce." *Id.* Accordingly, the Second Circuit concluded that "this type of incident does not realistically pose a threat to maritime commerce." *Id.* at 249.

Here, the activity in question can be described as throwing a small inert object from land at an individual onboard an anchored vessel. Like the fistfight in *Tandon*, we find that this type of incident "does not realistically pose a threat to maritime commerce." *Id.* First, unlike damage to an underwater structure, *see Grubart*, 513 U.S. at 538–39, or a collision between two vessels, *see Foremost Insurance Co.*, 457 U.S. at 675, throwing an inert object from land onto an anchored vessel does not create any potential for disrupting the course of the waterway or obstructing the free passage of commercial ships on the waterway. Second, unlike a fire on a marina, *see Sisson*, 497 U.S. at 363, or a plane crashing into the water, *see Foremost Insurance Co.*, 457 U.S. at 675 n.5, throwing an inert object from land onto an anchored vessel has no potential to damage nearby commercial vessels.

In sum, throwing an object like a coffee cup from land at an individual standing on an anchored vessel does not threaten a disruptive effect on maritime commerce because it does not have the potential of disrupting navigation, damaging nearby commercial vessels, or causing a commercial vessel to divert from its course. Accordingly, Hargus' claims do not satisfy the first prong of the two-prong

9

connection test, rendering the invocation of federal admiralty jurisdiction inappropriate.

## III.

For the foregoing reasons, we will vacate the District Court's judgment of September 30, 2015 and remand the matter with instructions that the District Court dismiss the case.