PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 16-1772
_____

IN THE MATTER OF THE COMPLAINT OF
CHRISTOPHER COLUMBIS, LLC, (t/a BEN FRANKLIN
YACHT), AS OWNER OF THE VESSEL
BEN FRANKLIN YACHT,
FOR EXONERATION FROM OR
LIMITATION OF LIABILITY


Christopher Columbus, LLC,
                                Appellant


_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(E.D. Pa. No. 2-14-cv-00214)
District Judge: Honorable Edward G. Smith
_____

Argued March 7, 2017
Before: HARDIMAN, KRAUSE, *Circuit Judges*, and
STENGEL, *Chief District Judge*.[*]

(Filed: September 25, 2017)

Daniel H. Wooster   [Argued]
Michael B. McCauley
Palmer Biezup & Henderson LLP
190 N. Independence Mall West, Suite 401
Philadelphia, PA 19106
    *Counsel for Appellant*

Stanley B. Gruber    [Argued]
Freedman & Lorry, P.C.
1601 Market Street, Suite 1500
Philadelphia, PA 19103

Michael T. van der Veen
Law Offices of Michael T. van der Veen
1219 Spruce Street
Philadelphia, PA 19107
    *Counsel for Appellee Michael Bocchino*

---

[*] The Honorable Lawrence F. Stengel, United States District Court for the Eastern District of Pennsylvania, sitting by designation. The Honorable Lawrence F. Stengel assumed Chief Judge status on August 1, 2017.

William J. Fox
1219 Spruce Street
Philadelphia, PA 19107
        *Counsel for Appellees James McHugh, Evan Medwid
        and Alexander Morella*

————————

OPINION OF THE COURT
————————

STENGEL, *Chief District Judge*.

Christopher Columbus, LLC appeals the District Court's dismissal of its limitation action, brought pursuant to the Limitation of Vessel Owner's Liability Act, 46 U.S.C. § 30511. Christopher Columbus filed this action after Appellee Michael Bocchino filed a negligence lawsuit against it in the Philadelphia Court of Common Pleas. Both of these actions arise out of a drunken brawl which erupted among passengers who were enjoying a cruise on the Delaware River onboard the vessel Ben Franklin Yacht. Following a hearing on the issue of subject-matter jurisdiction in the limitation action, the District Court found that maritime jurisdiction was lacking and dismissed the limitation action. For the reasons that follow, we find there is maritime jurisdiction over the dispute, and we will therefore vacate the District Court's dismissal of the limitation action.

## I       Background

Christopher Columbus owns and operates the passenger vessel "Ben Franklin Yacht," which provides cruise services

on the Delaware River.[1] The Ben Franklin Yacht, which is over eighty feet long and has three passenger decks, departs from and docks at Pier 24, located at 401 North Columbus Boulevard in Philadelphia, Pennsylvania. Pier 24 is located just north of the Ben Franklin Bridge and is adjacent to the main shipping channel of the Delaware River.

Bocchino was a patron on a cruise on the Ben Franklin Yacht on May 3, 2013. Bocchino was apparently "assaulted on the vessel and/or in the parking lot near the dock where the Ben Franklin Yacht was moored by 'unknown patrons of the cruise and/or agents, servant[s], workmen and/or employees'" of Christopher Columbus. App. 47a. Bocchino filed a complaint against the Ben Franklin Yacht and others in the Court of Common Pleas for Philadelphia County, alleging claims for negligence, negligent infliction of emotional distress, assault, and punitive damages. Christopher Columbus then filed its Complaint for Exoneration From or Limitation of Liability in federal court ("the limitation action"). Bocchino and three additional passengers on the May 3, 2013 cruise asserted claims in the limitation action, alleging that (1) while passengers for hire on the Ben Franklin Yacht, they were assaulted and injured by fellow passengers,[2] and (2) the vessel's crewmembers caused these injuries by providing

---

[1] The Ben Franklin Yacht is documented by the United States Coast Guard to carry paying passengers on cruises.

[2] Bocchino claimed to have been assaulted while aboard the vessel and in the parking lot on the pier, while the other three claimants alleged that they were assaulted on the vessel.

inadequate security and overserving alcohol to passengers. The claimants asserted that the assaults began while they were still onboard the vessel and while the vessel was in the process of berthing at Pier 24.

While cross-motions for summary judgment were pending, the District Court *sua sponte* ordered argument and invited briefing on the issue of subject-matter jurisdiction. After hearing oral argument, the District Court determined that the test for maritime jurisdiction had not been met and dismissed the limitation action for lack of subject-matter jurisdiction. For the reasons discussed below, we will reverse.

## II    Jurisdiction and Standard of Review

We have jurisdiction over this appeal under 28 U.S.C. § 1291. We review de novo a district court's determination of its own admiralty jurisdiction.[3] *Hargus v. Ferocious &*

_____

[3] This appeal comes to us in a somewhat unusual posture for a determination of admiralty jurisdiction. It is more often the case that the question of whether admiralty jurisdiction applies to a particular dispute is raised at the outset, and is therefore answered on the basis of the allegations in the pleadings. *See, e.g.*, *Maher Terminals, LLC v. Port Auth. of N.Y. & N.J.*, 805 F.3d 98, 104 (3d Cir. 2015). At the initial stages of litigation in this case, both sides agreed that there was subject-matter jurisdiction. It was only later, after the District Court had been presented with the parties' summary judgment motions and their competing sets of disputed facts taken from a developed evidentiary record, that the District Court questioned whether there was admiralty jurisdiction in this case. The nature of the "attack" on jurisdiction was, therefore, factual rather than facial. *See, e.g.*, *Constitution Party of Pa. v.*

*Impetuous, LLC*, 840 F.3d 133, 135 (3d Cir. 2016) (citing *Maher Terminals, LLC v. Port Auth. of N.Y. & N.J.*, 805 F.3d 98, 104 (3d Cir. 2015) and *Sinclair v. Soniform, Inc.*, 935 F.2d 599, 601 (3d Cir. 1991)).

## III    Discussion

Christopher Columbus raises three principal arguments on appeal, but we address only the first:[4] whether the District

*Aichele*, 757 F.3d 347, 358 (3d Cir. 2014) (distinguishing facial attacks on jurisdiction from factual attacks). Thus, while the issue did not arise in the context of a motion to dismiss, it is akin to a factual attack which "is an argument that there is no subject matter jurisdiction because the facts of the case—and here the District Court may look beyond the pleadings to ascertain the facts—do not support the asserted jurisdiction." *Id.* Accordingly, when assessing our subject-matter jurisdiction over Christopher Columbus's limitation action, we rely on the undisputed facts drawn from the summary judgment record. *See id.* (discussing "the standard of review applicable to a factual attack, in which a court may weigh and 'consider evidence outside the pleadings.'") (quoting *Gould Elecs. Inc. v. United States*, 220 F.3d 169, 176 (3d Cir. 2000)); *see also Hartig Drug Co. Inc. v. Senju Pharm. Co.*, 836 F.3d 261, 268 (3d Cir. 2016) (explaining that a factual attack on subject-matter jurisdiction "strips the plaintiff of the protections and factual deference provided under 12(b)(6) review.") (citing *Davis v. Wells Fargo*, 824 F.3d 333, 348–50 (3d Cir. 2016)).

[4] Because we find that the test for admiralty jurisdiction pursuant to 28 U.S.C. § 1333(1) is satisfied, we need not address Christopher Columbus's second and third issues on appeal: that the District Court erred in finding that the

6

Court erred in finding that the alleged incident aboard the Ben Franklin Yacht had insufficient potential to disrupt maritime commerce, and that therefore admiralty jurisdiction pursuant to 28 U.S.C. § 1333(1) was lacking. Appellee Michael Bocchino did not file a cross-appeal, so we do not address his contention that the District Court erred in dismissing his summary judgment motion as moot.[5]

Extension of Admiralty Jurisdiction Act, 46 U.S.C. § 30101(a), did not confer an independent basis for jurisdiction; and that the District Court erred in finding that the Limitation of Vessel Owner's Liability Act, 46 U.S.C. § 30501, *et seq.*, did not confer an independent basis for jurisdiction.

[5] Bocchino asserts that the entirety of the District Court's Dismissal Order is now before us for review because Christopher Columbus did not limit its Notice of Appeal to the portion of the Order dismissing the case for lack of subject-matter jurisdiction. He therefore urges us to consider whether his motion for summary judgment should have been granted, instead of being denied as moot, in light of what he contends are undisputed facts showing that he is entitled to summary judgment in the limitation action, so that he may then proceed in state court with his negligence action.

We have previously said that "an appellee may, without taking a cross-appeal, support the judgment as entered through any matter appearing in the record, though his argument may attack the lower court's reasoning or bring forth a matter overlooked or ignored by the court." *EF Operating Corp. v. Am. Bldgs.*, 993 F.2d 1046, 1048 (3d Cir. 1993) (citations omitted).

7

Under the United States Constitution, the federal courts have the power to hear "all Cases of admiralty and maritime Jurisdiction." U.S. Const. art. III, § 2, cl. 1. Congress codified that jurisdiction at 28 U.S.C. § 1333(1), which provides that federal district courts have original jurisdiction over "[a]ny civil case of admiralty or maritime jurisdiction." 28 U.S.C. § 1333(1). As noted in our recent decision in *Hargus v. Ferocious & Impetuous, LLC*, "[t]he fundamental interest

---

Here, Bocchino does not seek to support the District Court's decision to dismiss for lack of subject-matter jurisdiction, or its denial of the summary judgment motions as moot, through alternative grounds. Instead, he seeks to have his summary judgment motion granted on the merits, so that the limitation action can be dismissed and the case can be remanded to state court for a jury trial. In other words, he asks that, if we reverse the District Court on the issue of subject-matter jurisdiction, we decide the merits of his summary judgment motion in his favor. Seeking this form of relief, in light of the procedural history of this case, requires a cross-appeal. *See EF Operating Corp.*, 993 F.2d at 1048–49 (reasoning that "[a] grant of summary judgment and a dismissal for lack of personal jurisdiction . . . are wholly different forms of relief. The latter is a dismissal without prejudice, whereas the former is a ruling on the merits which if affirmed would have preclusive effect" and holding that a cross-appeal was required) (citation omitted). Accordingly, because Bocchino did not file a cross-appeal, we will not consider in the first instance his argument that summary judgment should have been entered in his favor, and leave it to the District Court to address the merits of that motion on remand.

giving rise to maritime jurisdiction is 'the protection of maritime commerce.'" 840 F.3d at 136 (quoting *Sisson v. Ruby*, 497 U.S. 358, 367 (1990) (citation omitted)).

With respect to maritime tort claims, the test for determining admiralty jurisdiction concerns both the incident's location and its connection with maritime activity:

> When a party seeks to invoke federal admiralty jurisdiction over a tort claim, the claim "must satisfy conditions both of location and of connection with maritime activity." *Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527, 534 (1995)). The location aspect is satisfied if "the tort occurred on navigable water" or the "injury suffered on land was caused by a vessel on navigable water." *Id.* The connection aspect is a conjunctive two-part inquiry. First, we "must 'assess the general features of the type of incident involved' to determine whether the incident has 'a potentially disruptive impact on maritime commerce.'" *Id.* (quoting *Sisson v. Ruby*, 497 U.S. 358, 363, 364 n.2 (1990)). Second, we "must determine whether 'the general character' of the 'activity giving rise to the incident' shows a 'substantial relationship to traditional maritime activity.'" *Id.* (quoting *Sisson*, 497 U.S. at 364 n.2, 365). Federal admiralty jurisdiction is only proper when the location test and both prongs of the connection test are satisfied. *Id.*

*Hargus*, 840 F.3d at 136.

As Bocchino concedes, the location aspect of the jurisdictional test is satisfied because the alleged tort occurred on the Delaware River. Bocchino also concedes that the second part of the connection test is satisfied, because carrying passengers for hire on a vessel on navigable waters is substantially related to traditional maritime activity. Thus, our analysis of whether there is admiralty jurisdiction in this case is focused on the first part of the connection test: an assessment of the general features of the incident, and whether such an incident has the potential to disrupt maritime commerce.

The United States Supreme Court has instructed courts to "assess the general features of the type of incident involved to determine whether such an incident is likely to disrupt commercial activity." *Sisson*, 497 U.S. at 363. Such an assessment "turns . . . on a description of the incident at an intermediate level of possible generality." *Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527, 538 (1995). As discussed in our decision in *Hargus*, *Sisson* and *Grubart* provide illustrative examples of how the specific factual details of an incident may be distilled into a description of the general character of that incident.

In *Sisson*, a fire started in the washer/dryer area of a pleasure yacht docked at a marina on Lake Michigan, which destroyed the yacht and damaged several other vessels as well as the marina. 497 U.S. at 360. For connection test purposes, the Court described the incident as "a fire that began on a noncommercial vessel at a marina located on a navigable

10

waterway."[6] *Id.* at 362. In *Grubart*, the Court considered an incident where "flooding [of basements in downtown Chicago allegedly] resulted from events several months earlier, when . . . Great Lakes Dredge and Dock Company had used a crane, sitting on a barge in the river next to a bridge, to drive piles into the riverbed above the tunnel." *Grubart*, 513 U.S. at 529. There, the Court described the incident as "damage by a vessel in navigable water to an underwater structure." *Id.* at 539.

Our own maritime tort jurisprudence is also instructive when crafting "general features" descriptions for purposes of applying the connection test to a particular set of facts. For example, in *Neely v. Club Med Management Services, Inc.*, we considered a scenario where a scuba-diving instructor and vessel crewmember was injured after being hit by a dive boat's propellers while she was out with resort patrons. 63 F.3d 166, 170 (3d Cir. 1995) (en banc). The description we chose for purposes of determining jurisdiction was "damage by a vessel in navigable water to [a seaman]." *Id.* at 179 (alteration in original). Most recently, in *Hargus*, we were presented with a case where the captain of the vessel One Love threw an empty insulated coffee cup from the beach that hit a passenger standing on the One Love, which at the time was anchored in knee-deep water approximately twenty-five feet away. *Hargus*, 840 F.3d at 134–35. We described that activity as "throwing a small inert object from land at an individual onboard an anchored vessel." *Id.* at 137.

---

[6] In a subsequent case, the Court referred to the incident in *Sisson* as "the burning of docked boats at a marina on navigable waters." *Grubart*, 513 U.S. at 533–34.

In formulating a general features description in this case, we are mindful of the Supreme Court's caution to avoid descriptions that are "too general" such that they cannot be useful in comparing cases, or descriptions that are overly specific such that they would ignore an incident's capacity to have an effect on maritime commerce. *See Grubart*, 513 U.S. at 538–39 (discussing the incident in *Sisson* and observing that "[t]o speak of the incident as 'fire' would have been too general to differentiate cases; at the other extreme, to have described the fire as damaging nothing but pleasure boats and their tie-up facilities would have ignored, among other things, the capacity of pleasure boats to endanger commercial shipping that happened to be nearby."). Rather, we must look at the facts of this case and formulate a description that will enable us to determine "whether the incident could be seen within a class of incidents that posed more than a fanciful risk to commercial shipping." *Id.* at 539. Applying these principles, we hold that the incident at issue here is best described as "an altercation between passengers on a boat in the process of docking." [7]

---

[7] Taking the disputed and undisputed facts into account, the District Court concluded that "the fight, if one occurred, erupted toward the end of the cruise." App. 9a–10a. The degree to which the Ben Franklin Yacht had completed docking was unclear as a result of conflicting deposition testimony from crewmembers and the claimants. The District Court specifically noted the following factual disputes: whether the vessel was docking or docked when the altercation occurred; the magnitude of the altercation and the total number of passengers involved, which was allegedly as many as forty to forty-five passengers; whether and when members of the crew became involved in resolving the altercation; and whether passengers left the vessel on their own or with the assistance of

Describing the incident this way captures the general nature of the tort and its attendant circumstances without being too generic or too specific.[8] *Grubart*, 513 U.S. at 538–39.

---

the vessel's employees and crew. Thus, although it is not possible to ascertain the location of the vessel relative to the pier on the summary judgment record before us, such a precise determination is unnecessary to resolve the question of subject matter jurisdiction. For purposes of crafting a general features description to which the connection test may be applied, we need only state that the vessel was "in the process of docking" while the altercation was occurring.

[8] After reviewing and comparing the witnesses' recollections and setting forth the parties' respective versions of the disputed facts based on the summary judgment record, the District Court concluded that the incident "should be described as something like a physical altercation among recreational passengers on board a vessel that is in the immediate process of docking." App. 23a. We respectfully disagree with the District Court's formulation of a general features description, as it is too specific in the following three ways: first, a verbal altercation arising at an inopportune time could be as distracting to the crew as a physical altercation; second, the fact that the passengers are "recreational" is not a determinative factor for admiralty jurisdiction, so long as the activity underlying the incident has a "substantial relationship to a 'traditional maritime activity,'" *Sisson*, 497 U.S. at 365; and third, the "immediacy" of the Ben Franklin Yacht's docking at the time the altercation started is not clear from the record. For these reasons, we have chosen the slightly more generalized description set forth above.

Having crafted our description of the general features of the incident in this case, we must now "ascertain 'whether the incident could be seen within a class of incidents that posed more than a fanciful risk to commercial shipping.'" *Hargus*, 840 F.3d at 136 (quoting *Grubart*, 513 U.S. at 539). We turn to the first prong of the connection test, which "requires us to assess the 'potential' disruptive effects that the type of incident involved could have on maritime commerce, not whether the particular incident at hand actually disrupted maritime commerce." *Id.* at 136 (quoting *Grubart*, 513 U.S. at 538–39). A brief review of our discussion in *Hargus* illustrates the type of factors to consider when assessing an incident's potential to disrupt maritime commerce.

In *Hargus*, we discussed *Tandon v. Captain's Cove Marina of Bridgeport, Inc.*, a Second Circuit case which involved an injury to passengers that did not have the potential to disrupt maritime commerce. *Hargus*, 840 F.3d at 137 (citing *Tandon*, 752 F.3d 239, 249 (2d Cir. 2014)). The Second Circuit described the general features of the incident as "a physical altercation among recreational visitors on and around a permanent dock surrounded by navigable water." *Tandon*, 752 F.3d at 249. The court found that the incident did not have the potential to disrupt maritime commerce because it "threaten[ed] only its participants," could not "create any obstruction to the free passage of commercial ships along navigable waterways" or "lead to a disruption in the course of the waterway itself," and could not "immediately damage nearby commercial vessels." *Id.* In addition, because the incident did not occur at sea, it "could not 'distract the crew from their duties, endangering the safety of the vessel and risking collision with others on the same waterway,'" nor could it "force the vessel 'to divert from its course to obtain medical

care for the injured person,'" who "was not 'employed in maritime commerce.'" *Hargus*, 840 F.3d at 137 (quoting *Tandon*, 752 F.3d at 250). The Second Circuit was careful to note that "the class of incidents we consider here includes only fights on permanent docks . . . . This type of incident does not pose the same risks to maritime commerce as a fistfight occurring on a vessel on navigable water." *Tandon*, 752 F.3d at 250. This was so, in part because "[a] fight on a vessel may distract the crew from their duties, endangering the safety of the vessel and risking collision with others on the same waterway." *Id.*

Similar assessments in this case lead us to conclude that an altercation between passengers on a boat in the process of docking has the potential to disrupt maritime commerce. Although the record is unclear about the location of the vessel when the fight broke out, how many people were involved in the fight, and the crew's involvement, if any, in stopping the fight, there are numerous scenarios that could result from a passenger altercation, each of which poses more than a fanciful risk to maritime commerce. First, this type of incident has the potential to distract the captain or crew during the docking procedure, which could have resulted in the vessel crashing into or in some way colliding with the pier, causing damage to the vessel or to the pier. Depending on the degree of damage to the pier, it could be rendered unusable. Second, a mishap during docking also has the potential to cause injuries to passengers or the crew, the latter of which could leave the vessel unable to dock at the pier. Such injuries could require a rescue of those on board, which might then lead to a Coast Guard investigation. Finally, if the crew was sufficiently sidetracked by the altercation and unable to execute the docking maneuver, the vessel could be forced back out on the

15

waterway with a veritable riot among the passengers. That would certainly be distracting to the captain and crew, and also pose a risk to nearby vessels. Any of these outcomes were possible, and all have the potential to disrupt maritime commerce.

Bocchino's argument to the contrary is not persuasive. He asserts that, due to the nature of the finger pier where the Ben Franklin Yacht docks, the vessel was not in open waters during the altercation, and thus could not encounter other vessels or block their navigation, cause a disruption on the waterway, or cause any immediate damage to other vessels while docking because it was in an isolated location. This argument has two flaws. First, it depends in part on the overly-specific "general features" description Bocchino proposes, which characterizes Pier 24 as an "isolated location." Bocchino Br. 18 n.4. Second, it focuses on what did not actually happen to the Ben Franklin Yacht as a result of the altercation taking place while the vessel was in the process of docking, rather than what *could* have happened. As previously stated, the connection test requires us to "assess the 'potential' disruptive effects that the type of incident involved *could* have on maritime commerce, not whether the particular incident at hand *actually* disrupted maritime commerce." *Hargus*, 840 F.3d at 136 (emphases added) (citing *Grubart*, 513 U.S. at 538–39); *see also Tandon*, 752 F.3d at 252 n.8 (noting that, to the extent that the parties arguing in favor of maritime jurisdiction rested their argument "on specific aspects of the incident that actually occurred, [that argument] clearly fails, because our analysis looks only to the general type of incident at issue rather than particular facts about that incident.") (citing *Grubart*, 513 U.S. at 538). Had the altercation distracted the crew or required their intervention during the docking

16

process—two very real possibilities—any damage to the vessel or the pier that may have resulted could easily have caused a disruption to maritime commerce.[9] Hence, our conclusion that the first prong of the connection test is met. As the other aspects of the location and connection tests are satisfied, we therefore hold that admiralty jurisdiction is appropriate in this case.

\*     \*     \*

For the reasons stated, we will reverse the judgment of the District Court and vacate its dismissal of the limitation action. This case is remanded for further proceedings consistent with this opinion.

---

[9] We respectfully disagree with the District Court's assessment that, based on its view that the Ben Franklin Yacht was in the immediate process of docking when the altercation started, the risk of disrupting maritime commerce was merely fanciful. The general features of this type of incident, which are what we must consider for purposes of determining jurisdiction, demonstrate that there is a potential for an altercation between passengers on a boat in the process of docking to disrupt maritime commerce, and that the potential for disruption to maritime commerce is more than fanciful.