Filed 9/3/25; On remand; Certified for Publication 9/10/25 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| BRIAN RANGER,<br><br>      Plaintiff and Appellant,<br><br>v.<br><br>ALAMITOS BAY YACHT CLUB,<br><br>      Defendant and Respondent. | B315302<br><br>Los Angeles County<br>Super. Ct. No. 19STCV22806 |

APPEAL from a judgment of the Superior Court of Los Angeles County, Mark C. Kim, Judge.  Reversed and remanded.

Krissman & Silver, Jarod Krissman; McGuinn Hillsman & Palefsky and John Hillsman for Plaintiff and Appellant.

Cox, Wootton, Lerner, Griffin & Hansen, Neil S. Lerner and Mitchell S. Griffin for Defendant and Respondent.

_____

Brian Ranger slipped and fell while mooring a boat as part of his duties for employer Alamitos Bay Yacht Club.  He sued the

Club for general maritime claims of negligence and unseaworthiness. The trial court dismissed the suit, finding no admiralty jurisdiction. We affirmed on different grounds, holding California's worker's compensation scheme represented Ranger's only avenue of recovery. The Supreme Court reversed, finding neither the Longshore and Harbor Workers' Compensation Act of March 4, 1927 (Longshore Act, 33 U.S.C. § 901 et seq.) nor the California's workers' compensation law foreclosed Ranger's general maritime claims in *Ranger v. Alamitos Bay Yacht Club* (2025) 17 Cal.5th 532 (*Ranger*). The Supreme Court remanded the case to us to consider in the first instance: 1) whether federal jurisdiction exists; 2) whether Ranger can assert the tort of unseaworthiness; and 3) whether Ranger can assert a negligence claim against his vessel-owning employer.

We hold Ranger has properly asserted claims for unseaworthiness and negligence against the Club.

## I

The Club hired Ranger as a maintenance worker in March 2017. In May 2018, Ranger's duties expanded to include assistance with the Club's fleet of boats, including painting the boats, making onboard engine oil changes, hoisting boats in and out of navigable waters, mooring boats in navigable waters, unloading moored boats, cleaning boats, maintenance and repair work, and securing onboard equipment. To perform some duties, Ranger had to board boats in navigable waters.

In August 2018, the *Latham B*, a boat owned by the Club, underwent maintenance. Ranger assisted in returning the boat to the water by hoist. Once it was in the water, Ranger stepped onto the front of the boat to unhook the boom and secure a

2

mooring line.  He fell and was injured on the slippery front of the boat.

Ranger filed a claim under the California Workers' Compensation Act, Labor Code section 3200 et seq. (California Act).  Later, Ranger filed suit in admiralty jurisdiction in the superior court alleging claims for general maritime negligence and unseaworthiness.  The Club demurred to the operative complaint on the grounds that admiralty jurisdiction did not apply and the California Act was Ranger's sole and exclusive remedy.  The trial court sustained the demurrer without leave to amend, holding admiralty jurisdiction did not cover Ranger's claims because his "injury was sustained on the deck of a boat docked at a private yacht club, and the boat was not used for commerce."  The trial court did not reach the issue of whether the California Act provided Ranger's exclusive remedy.

Ranger appealed.  We affirmed on the grounds that the California Act represented Ranger's exclusive relief.  (*Ranger v. Alamitos Bay Yacht Club* (2023) 95 Cal.App.5th 240, 242–243.)

The Supreme Court reversed.  It ruled the Longshore Act's exclusion of club workers from the act's coverage meant only that the state, rather than the federal, workers' compensation system applies, but did not otherwise deprive workers of their federal right to pursue available tort remedies under general maritime law.  (*Ranger*, *supra*, 17 Cal.5th at p. 548.)  The court remanded the case to us to consider: 1) whether federal jurisdiction exists; 2) whether Ranger can assert the tort of unseaworthiness; and 3) whether Ranger can assert a negligence claim against his vessel-owning employer.  (*Ibid*.)

II

3

We hold admiralty jurisdiction applies to Ranger's claim.

A

Ranger's claim falls under admiralty jurisdiction.

1

We begin with pertinent principles of admiralty jurisdiction.

Traditionally, courts determined whether admiralty jurisdiction applied by a simple locality test: all torts that occurred on navigable waters fell within admiralty jurisdiction. (*Jerome B. Grubart v. Great Lakes Dredge & Dock Co.* (1995) 513 U.S. 527, 531–532 (*Grubart*).)  In 1972, the U.S. Supreme Court recognized that, given the evolving realities of the industrialized world, mechanical application of this test was no longer sensible. (*Exec. Jet Aviation v. City of Cleveland* (1972) 409 U.S. 249, 261.) In that case, a plane struck a flock of seagulls soon after takeoff and sank in the navigable waters of Lake Erie.  (*Id.* at p. 250.) Despite the location of the injury in navigable waters, the U.S. Supreme Court found the tort did not belong in admiralty jurisdiction because it did not significantly relate to maritime activity.  (*Id.* at p. 268.)  Thus began the modern test for admiralty jurisdiction.

The *Grubart* decision held that a party seeking to invoke admiralty jurisdiction must satisfy a two-part test: 1) location; and 2) connection with maritime activity.  (*Grubart*, *supra*, 513 U.S. at p. 534.)  To meet the location requirement, the party must show the tort occurred on navigable water or was caused by a boat on navigable water.  (*Ibid.*)  The connection prong involves two steps.  (*Ibid.*)  The court must first assess the general features of the type of incident involved to determine whether it can have a potentially disruptive impact on maritime commerce.

4

(*Ibid.*)  Second, the court must determine whether the general character of the activity that gave rise to the incident relates substantially to traditional maritime activity.  (*Ibid.*)

2

We apply the *Grubart* test.

In reviewing an order on a demurrer, our review is independent, and we accept as true the facts alleged.  (*Blank v. Kirwan* (1985) 39 Cal.3d 311, 318.)

a

The location test is straightforward.  The trial court properly found Ranger satisfied this prong by alleging he slipped on a boat on navigable waters.  The Club concedes this point.

b

The connection prong of the test includes two steps, and the first step has two subparts.  The trial court found Ranger failed the first step of the connection test.

To apply the first subpart of the first step of the connection prong, the court assesses the general features of the incident. (*Grubart*, *supra*, 513 U.S. at p. 534.)  In doing so, the court must apply an intermediate level of generality.  (*Id*. at pp. 538–539.) The Supreme Court of the United States illustrated this process, using its decision in *Sisson v. Ruby* (1990) 497 U.S. 358 as an example.  (*Grubart*, *supra*, 513 U.S. at pp. 538–539.)  In *Sisson*, a pleasure boat docked at a private marina caught fire.  (*Id*. at p. 533.)  The fire spread to the dock and to other pleasure boats docked there.  (*Ibid.*)  Applying an intermediate level of generality, the Court described the general features of that incident as: "a fire on a vessel docked at a marina on navigable waters."  (*Id*. at p. 538.)  The Court explained that describing "the incident as 'fire' would have been too general to differentiate

5

cases." (*Ibid.*) On the other hand, describing "the fire as damaging nothing but pleasure boats and their tie-up facilities, would have ignored, among other things, the capacity of pleasure boats to endanger commercial shipping that happened to be nearby." (*Id.* at pp. 538–539.)

Once the court has identified the general features of the incident, it moves to the second subpart, in which it must evaluate whether the incident is the type that could potentially disrupt maritime commerce. (*Grubart, supra,* 513 U.S. at pp. 534, 539.) Importantly, the court does not consider whether the incident at hand had an actual impact on maritime commerce or the particular facts of the instant case. (*Sisson, supra,* 497 U.S. at p. 363.) Instead, the court confines its inquiry to whether this *type* of incident *could* disrupt maritime commerce. (*Ibid.*) The Supreme Court has warned that extending admiralty jurisdiction only to those persons and boats actually engaged in commercial maritime activity does not adequately safeguard the federal interest in protecting maritime commerce. (*Foremost Ins. Co. v. Richardson* (1982) 457 U.S. 668, 674–675 (*Foremost*).) Rather, uniform rules of conduct must apply to all boat operators on navigable waters because the conduct of any boat operator has the potential to affect other boats regardless of commercial status. (*Ibid.*)

i

We begin with subpart one of the first step: identifying the features of the incident at an intermediate level of generality.

The trial court described the general features of the incident as an "injury . . . sustained on the deck of a boat docked at a private yacht club, and the boat was not used for commerce." The Club advocates a description that specifies the injury was a

6

slip and fall and that the boat was secured to the yacht club marina dock at the time.

Ranger argues the trial court's description is too specific.

Applying an intermediate level of generalization, an apt description of the incident is an injury to a person boarding a boat docked at a marina on navigable waters.

Precedents support this description.

In *Foremost*, two pleasure boats collided in a remote area. (*Foremost*, *supra*, 457 U.S. at pp. 670–671 & fn.2.) The court described the general features of the incident as a "collision between two vessels on navigable waters." (*Id*. at p. 677.) Neither the noncommercial nature of the boats nor the remote location of the actual collision was relevant. (*Id*. at pp. 668–683.)

In *Sisson*, as discussed above, a pleasure boat docked at a yacht club caught fire, which spread to the dock and other pleasure boats docked there. (*Sisson*, *supra*, 497 U.S. at p. 360.) The court's formulation of the incident included neither the noncommercial nature of the boats nor the fact that the dock was at a yacht club. (*Id*. at 363.)

The trial court's focus on the noncommercial nature of the boat and the nature of the marina as belonging to a yacht club was inconsistent with the explanation of the broad federal interest in *Foremost*, *supra*, 457 U.S. at pp. 674–675.

The Fourth and Eleventh Circuits have reached similar conclusions in analogous cases.

In *White v. United States* (4th Cir. 1995) 53 F.3d 43, 47 (*White*), a contractor hired a security guard to guard a navy ship the contractor was repairing. (*Ibid*.) The ship was docked at a naval base pier. (*Ibid*.) While disembarking from the ship, the security guard lost her balance as she stepped onto a wooden

7

platform at the end of the gangway and collided with equipment stored on the pier.  (*Ibid.*)  The Fourth Circuit described the general features of the incident as "injury to a person disembarking from a vessel in navigable water."  (*Ibid.*)

In *Alderman v. Pacific Northern Victor, Inc.* (11th Cir. 1996) 95 F.3d 1061, 1063 (*Alderman*), a carpenter slipped in oil on board a ship where he was assisting in installing an elevator as part of a conversion of the ship from an oil driller to a fish processing ship.  The Eleventh Circuit described the general features as "an onboard injury which occurred during the repair, maintenance or conversion of a vessel."  (*Id.* at p. 1064.)

*Barber v. Marina Sailing, Inc.* (1995) 36 Cal.App.4th 558, 561 (*Barber*) reached a similar conclusion.  A passenger who was an experienced sailor agreed to help undock a pleasure boat.  The skipper started the boat without warning, and the dock line caught around the passenger's finger and severed it.  (*Ibid.*)  The court characterized the general features as a skipper or pilot moving his ship without warning to those casting off the dock lines.  (*Id.* at p. 568.)

In sum, the appropriate description of this event is an injury to a person embarking on a boat docked at a marina on navigable waters.

ii

The second subpart of the first step asks whether the incident is the kind that can potentially disrupt maritime commerce.

The trial court said no.  But it based that evaluation on a characterization that was too specific.

Under the appropriately general features of the incident, the correct answer is yes: this kind of incident can potentially

8

disrupt maritime commerce.  We make this inquiry without regard to the actual effect on maritime commerce or the particular facts here.  (*Sisson*, *supra*, 497 U.S. at p. 363.)

An injury to a person boarding a boat docked at a marina has the potential to disrupt maritime commerce.

Case law supports this conclusion.

In *White*, the Fourth Circuit found that inability safely to disembark from a boat would "greatly inhibit a variety of activities essential to commercial shipping, more specifically loading, resupply, and the coming and going of crew and contractors."  (*White*, *supra*, 53 F.3d at p. 47.)

The Eleventh Circuit similarly found an injury occurring during the repair, maintenance, or conversion of a boat could disrupt repairs to that boat, to other boats being worked on at the same dock, or to other boats waiting for service.  (*Alderman*, *supra*, 95 F.3d at p. 1064.)

The *Barber* court likewise found a captain or skipper moving the boat without warning to those casting off the dock lines posed a potential threat of disruption to maritime commerce.  (*Barber*, *supra*, 36 Cal.App.4th at p. 568.)  The court noted this conduct could easily result in injury to passenger or crew member requiring rescue efforts that would hinder commercial activities at the dock.  (*Ibid*.)  This conduct could also cause damage to the dock if the dock lines remained attached. (*Ibid*.)

These analyses suggest safe boarding is necessary to many activities essential to maritime commerce.  Ranger's unsafe boarding had the potential to disrupt maritime commerce.

The Club cites cases involving docked or anchored boats in which the court found the involved incidents could not affect maritime commerce. Each case is distinguishable.

*Tandon v. Captain's Cove Marina of Bridgeport, Inc.* (2d Cir. 2014) 752 F.3d 239, 248–249 and *Endrody v. M/Y Anomaly* (W.D.Wash. Feb. 7, 2006, No. C04-2142Z) 2006 WL 8454761, *2 involved physical altercations on a permanent pier and docked boats. Fighting is not a traditional maritime commercial activity.

*Hargus v. Ferocious & Impetuous, LLC* (3d Cir. 2016) 840 F.3d 133, 137 (*Hargus*) and *H2O Houseboat Vacations Inc. v. Hernandez* (9th Cir. 1996) 103 F.3d 914 (*H2O Houseboat*) both involved injuries to people on boats anchored or tied to shore. In *Hargus*, a person on shore threw an object at a person on the boat. (*Hargus, supra*, 840 F.3d at pp. 137–138.) In *H2O Houseboat*, the family on the boat suffered carbon monoxide poisoning. (*H2O Houseboat, supra*, 103 F.3d at p. 916.) The effects of those injuries were in all probability confined to the boats themselves. (*Hargus, supra*, 840 F.3d at p. 138; *H2O Houseboat, supra*, 103 F.3d at pp. 916–917.)

We respectfully disagree with *Boudwin v. Hastings Bay Marina, Inc.* (E.D.Ark. Jul. 11, 2008, No. 4:07CV00299 JLH) 2008 WL 2741557, aff'd (8th Cir. 2010) (*Boudwin*), where a marina employee was showing a boat docked at the marina to a potential buyer. (*Id*. at p. 1*.) Unbeknownst to the buyer, the employee opened a hatch on the boat. The buyer fell through the hatch. (*Ibid*.) The court described the incident as an injury "isolated to a single pleasure boat docked at a yacht club," before finding it could not affect maritime commerce. (*Id*. at p. *3.) This is the incorrect level of generality. The *Barber* court cited with approval a case with similar facts that reached the opposite

10

result.  (*Barber*, *supra*, 36 Cal.App.4th at pp. 567–568 [citing *Emery v. Rock Island Boatworks, Inc.* (C.D. Ill. 1994) 847 F.Supp. 114, 115–116 (*Emery*)].)  The *Emery* court found a passenger's fall through an open man-hole/scuttle hole in the aisle of a boat could threaten maritime commerce, noting that a pilot or crew member could have a similar accident.  (*Emery*, *supra*, 847 F.Supp at pp. 115–116.)  Even where the accident involved a passenger, extraordinary rescue measures might be necessary and might disrupt commerce.  (*Id*. at p. 116.)  The reasoning of the *Emery* court is more in line with the Supreme Court precedent we have described.

In conclusion, Ranger wins on this step.

iii

We turn finally to the second step of the connection test: determining whether the general character of the activity giving rise to the incident bears a substantial relationship to traditional maritime activity.  The trial court did not reach this step of the test.

The general activity here was returning a boat at a marina to navigable waters after maintenance.  In *Sisson*, the Supreme Court of the United States found that "storage and maintenance of a vessel at a marina on navigable waters" is "a common, if not indispensable, maritime activity."  (*Sisson*, *supra*, 497 U.S. at pp. 365–367.)  Ranger slipped while involved in maintaining and storing this boat at a marina on navigable waters.  This satisfies the test.

Because Ranger's incident satisfies both the location and connection requirements of the *Grubart* test, the trial court erred in finding admiralty jurisdiction did not exist.

11

We need not and do not reach Ranger's argument under the Admiralty Extension Act.

B

We next turn to the Club's contention that, even if Ranger's claim is within admiralty jurisdiction, he cannot bring a claim for unseaworthiness because this claim can only be brought by Jones Act seamen. This argument is incorrect. Ranger has an unseaworthiness claim.

Before 1946, unseaworthiness claims could be brought only by a seaman employed by the vessel owner. (*Seas Shipping Co. v. Sieracki*, (1946) 328 U.S. 85.) This changed with the *Sieracki* decision. (*Id.* at pp. 95–96.) *Sieracki* allowed workers doing the ship's business to bring an unseaworthiness claim, regardless of whether that person's employer was the vessel owner or a third party. (*Ibid.*) This included those covered by the Longshore Act, but, contrary to the Club's assertion, was not limited to them.

Legal developments after *Sieracki* made the situation more complex. We conclude a *Sieracki* claim remains available to Ranger, but we describe the post-*Sieracki* uncertainties.

A few years after *Sieracki*, the Supreme Court decided *Ryan Stevedoring Co. v. Pan-Atlantic S.S. Corp.* (1956) 350 U.S. 124, 134–145 (*Ryan*), which allowed the vessel owners now liable under *Sieracki* to sue employers for indemnification.

*Sieracki* and *Ryan* led to a significant increase in litigation. In 1972, Congress stepped in. (*Edmonds v. Compagnie Generale Transatlantique* (1979) 443 U.S. 256, 262 (*Edmonds*).) Congress amended the Longshore Act to "eliminate the shipowner's liability to the longshoreman for unseaworthiness and the stevedore's liability to the shipowner for unworkmanlike service resulting in injury to the longshoreman—in other words, to

12

overrule *Sieracki* and *Ryan*." (*Ibid*.) In return, Congress also increased the amount of compensation available under the Longshore Act. (*Sun Ship v. Pa.* (1980) 447 U.S. 715, 723–724.)

Courts have disagreed about whether a *Sieracki* claim still exists for those *not* covered by the Longshore Act. (*Cavin v. State* (Alaska 2000) 3 P.3d 323, 331–332 ["Courts entertaining unseaworthiness actions since 1972 have split on this question"].)

The language of the Longshore Act itself is clear that its exclusive compensation provision applies only to those covered by the Longshore Act. (*Aparicio v. Swan Lake* (5th Cir. 1981) 643 F.2d 1109, 1116 (*Aparicio*) ["Literally read, Section 905(b), which Congress enacted to abolish the *Sieracki* remedy, does not apply to maritime workers who are not within the coverage of the [Longshore Act]"].)

Some courts, however, have found the clear intention of Congress, despite the language used, was to eliminate this type of claim for *all* litigants. (*Grice v. A/S J. Ludwig Mowinckels* (S.D. Ala. 1979) 477 F.Supp. 365, 370–371 (*Grice*) [Congress intended in 1972 to abolish the entire class of *Sieracki* seamen].)

To overcome the words of the statute, courts have pointed to language in a later Supreme Court case stating *Sieracki* has been overruled: Congress meant to "overrule *Sieracki* and *Ryan*." (*Edmonds*, *supra*, 443 U.S. at p. 262.) The *Edmonds* case, however, considered only claims brought by those covered by the Longshore Act.

Other Supreme Court cases have suggested such claims still exist: workers not covered by the Act "may still recover under an applicable state workers' compensation scheme *or, in admiralty, under general maritime tort principles* (which are admittedly less generous than the Jones Act's protections)."

13

(*Chandris, Inc. v. Latsis*, (1995) 515 U.S. 347, 356 [italics added]; see also *Dutra Grp. v. Batterton* (2019) 588 U.S. 358, 376, [quoting *Sieracki, supra*, 328 U.S. at 100 "(The duty of seaworthiness is 'peculiarly and exclusively the obligation of the owner. It is one he cannot delegate')"].)

Still other courts have been guided by the statutory language enacted. Both lines of cases agree the legislative history shows Congress did not explicitly consider workers not covered by the Longshore Act affected by *Sieracki*. (See, e.g., *Grice, supra*, 477 F.Supp. at p. 368 ["there is no hint in the legislative history that it occurred to anyone in Congress that *Sieracki* might, unlike the Longshoreman's Act, have extraterritorial effect, or otherwise retain some life in various geographic or occupational pockets no one thought about in 1972"]; *Aparicio, supra*, 643 F.2d at p. 1116–1117 ["the legislative history indicates that no member of Congress considered the fact that the *Sieracki* doctrine applies to workers not protected by the [Longshore Act]"].) Courts looking to the statutory language find that the lack of consideration of such workers argues in support of finding *Sieracki* still applies to them. For, as one court put it, "[h]ad Congress intended to affect the substantive rights of persons not covered by the [Longshore Act], it could readily have manifested that intention." (*Aparicio, supra*, 643 F.2d at p. 1116.) Under this view, Congress focused only on the category causing the most consternation and the one that represented the majority of the workers at issue: workers covered by the Longshore Act. (*Id*. at p. 1118.)

A supporting consideration is that the 1972 amendment was a compromise: "The legislative termination of the warranty of seaworthiness owed to the *Sieracki* seaman and the

concomitant ending of the stevedore's contractual indemnification of the shipowner for that liability were enacted as the quid pro quo for the increase in compensation benefits payable under the [Longshore Act]." (*Aparicio*, *supra*, 643 F.2d at p. 1117.) As the workers not covered by the Longshore Act did not receive "pro," it is not surprising they should be excluded from the "quid."

As our Supreme Court recently put it in describing certain workers excluded from the Longshore Act, it is sensible "to hold that club workers are excluded from the bitter as well as the sweet of the [Longshore Act]." (*Ranger*, *supra*, 17 Cal.5th at p. 542.)

The latter position is the sound interpretation. The language of the Longshore Act limits it to those covered. (33 U.S.C. § 905(b).) The language of the legislative history shows Congress was not considering or addressing those not covered. The benefit obtained in connection with the loss of the right to sue would not apply to those workers not covered by the Longshore Act.

This analysis shows that workers not covered by the Longshore Act retain their rights under *Sieracki*.

The Club argues uniform treatment has long been a goal of such legislation, and this principle supports finding all *Sieracki* claims were eliminated. This is incorrect. Leaving those not covered by the Longshore Act with a *Sieracki* claim means they still have some form of recovery, as do those covered by the Longshore Act. Eliminating it would mean those covered by the Longshore Act would have a generous recovery, and those not covered would have none. This does not promote uniformity.

The Club urges us to follow *Normile v. Maritime Co. of Philippines* (9th Cir. 1981) 643 F.2d 1380, 1382, which found

15

*Sieracki* had been overruled in its entirety, to avoid creating a split and the potential for forum shopping. However, our sister court in *Freeze* already disagreed with *Normile*. (*Freeze v. Lost Isle Partners* (2002) 96 Cal.App.4th 45, 51–52). Most importantly, in our judgment, *Freeze*, *Aparicio*, and similar cases have the better argument.

The *Sieracki* claim remains available to Ranger.

C

We turn finally to the Club's faulty contention that Ranger cannot bring a claim against it for negligence as a vessel owner because it is also his employer. The Club's argument fails because it is founded in the Longshore Act, which does not cover Ranger.

The Club argues changes the 1984 amendments made to the Longshore Act relating to who could bring a negligence claim against a vessel owner preclude Ranger's suit. (*Jones v. Dutra Construction Co.* (1997) 57 Cal.App.4th 871, 877; *Ducrepont v. Baton Rouge Marine Enters.* (E.D. La. 1987) 666 F.Supp. 882, 886 (*Ducrepont*).) As amended, section 905(b) prohibited people engaged in "shipbuilding, repairing, or breaking services" to bring a negligence claim against their employer in any capacity, including as vessel owner. (33 U.S.C. § 905(b).) Because Ranger was engaged in repair services, the Club thus argues, he cannot bring a negligence suit against the Club, his vessel-owning employer. We need not reach the question of whether the Club engaged Ranger for repair work because, as discussed, the Longshore Act does not cover Ranger. Thus, any limitation on repair workers bringing a negligence claim against the vessel owner does not apply to Ranger.

16

The Club also makes a different argument that carries no force. This invalid argument maintains the amendments show Congress's recognition that it would be illogical to allow people employed to do repair work to sue the employer in the capacity of vessel owner while doing the work they are employed to do. Any lack of logic would flow, however, from the fact that the employee already has a remedy under the Longshore Act. But this fact does not apply to Ranger, who is not covered by the Longshore Act. This argument fails.

The Club cites inapposite cases. It relies on these cases to support its claim that an employee cannot bring a claim against a dual capacity vessel employer. But each case addresses an employee covered by the Longshore Act or the Jones Act. (See *Edmonds*, *supra*, 443 U.S. at p. 258 [worker covered by the Act]; *Gravatt v. City of New York* (2d Cir. 2000) 226 F.3d 108, 111 [worker covered by the Longshore Act]; *Ducrepont*, *supra*, 666 F.Supp. at p. 889 [same]; *Heise v. Fishing Co.* (9th Cir. 1996) 79 F.3d 903, 905 n.1 [no argument worker not covered under the Longshore Act]; *Gay v. Barge 266* (5th Cir. 1990) 915 F.2d 1007, 1010 [same]; *Scindia Steam Navigation Co. v. De Los Santos* (1981) 451 U.S. 156, 162–163 [same].) These cases do not apply because Ranger falls outside the protection of these statutes.

The Club asserts it has found no case law supporting the proposition that a worker like Ranger, not covered by the Longshore Act, can sue his vessel-owning employer in its capacity as employer simply because he is excluded from the Longshore Act. It would be more relevant if the Club pointed to case law that prohibited a worker in Ranger's situation from suing his vessel owner employer, but the Club does not do so. The fact that the Longshore Act only prohibits workers engaged in certain

17

types of service to the vessel from bringing a negligence claim suggests that even covered workers not engaged in those services can sometimes appropriately sue the vessel owner for negligence. The Club has not established Ranger cannot sue the Club for negligence as the vessel owner.

## DISPOSITION

We reverse and remand for further proceedings consistent with this opinion.  Costs to the appellant.



WILEY, J.


We concur:



STRATTON, P. J.



VIRAMONTES, J.

18

Filed 9/10/25

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| BRIAN RANGER,<br><br>Plaintiff and Appellant,<br><br>v.<br><br>ALAMITOS BAY YACHT CLUB,<br><br>Defendant and Respondent. | B315302<br>Los Angeles County<br>Super. Ct. No. 19STCV22806<br><br>**ORDER CERTIFYING**<br>**OPINION**<br>**FOR PUBLICATION**<br><br>**[No change in judgment]** |

THE COURT:

The opinion in the above-entitled matter filed on September 3, 2025, was not certified for publication in the Official Reports.  For good cause, it now appears that the opinion should be published in the Official Reports and it is so ordered.

There is no change in the judgment.

_____

STRATTON, P. J.          WILEY, J.          VIRAMONTES, J.